[Crim. No. 4692. Third Dist. Oct. 29, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. WILL STOKLEY, Defendant and Appellant.

Will Stokley, in pro. per., and Robert J. Nareau, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws and Eddie T. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

BRAY, J.* — Defendant appeals from the judgment of conviction after jury verdict of violation of Penal Code, section 470 (forgery and uttering).[1]

## QUESTIONS PRESENTED

1. Alleged prejudicial misconduct of the deputy district attorney

(a) in attempting to prove an alleged incriminating statement by defendant to a bail bondsman,

(b) alleged reference to items which court held inadmissible,

(c) Cross-examining defendant concerning his refusal to give exemplars of his handwriting.

2. No counsel at the lineups.

3. Alleged ineffectiveness of counsel.

4. Other contentions of defendant.

## EVIDENCE

Ronald Mickens, United States Air Force, on March 17, 1967, missed his wallet, containing his military identification card, the morning after working at the Mo-Mo Club, a place defendant admittedly frequented. On March 23, defendant, a Negro, presented to the Freeport-Wentworth branch of the Bank of America at Sacramento a money order for $150 made out to Ronald Mickens. The bank teller called an official, Eugene Lang, who told defendant (whom he positively identified at the trial) that the bank's policy was not to cash money orders. However, as defendant had his wallet on the counter with Mickens' military I.D. card displayed, Lang, recalling the problem servicemen had in cashing checks, gave his approval to the cashing of the money order. At the trial the teller was uncertain as to whether it was defendant who presented the money order. She was positive that it was not Bob Weatherhead, defendant's witness, who testified that he was the one who presented the order using Mickens' I.D. card.

This money order had been purchased at Van's Market for $1.00 and thereafter raised to $150. Evidence of other instances of passing raised money orders by defendant was introduced.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1] A count of forgery of an endorsement and one of violation of Penal Code, section 475a (possession of instrument with intent to defraud), were dismissed.

On March 29 two money orders were purchased at Van's, each for $2.00 and each of which was raised to $150. The same day a teller at the Colusa Branch of the Wells Fargo Bank cashed one of these money orders for defendant, who presented Mickens' I.D. card for identification. The teller positively identified defendant as the person who presented the money order. The handwriting on the face of the money order was shown to be that of defendant. The same day the other money order, made out to Charles Ford, was cashed at the Yuba City branch of Wells Fargo by defendant. On April 13 defendant cashed a $150 money order made out to Charles Ford at the D & M Market in Colfax, buying some groceries. The same day the manager of Raley's Drug Center in Chico, after cashing a money order for $150 for Bob Weatherhead, became suspicious, followed the latter out of the store, and saw him pause momentarily at a white Mustang in which two Negroes were sitting. The manager could not identify defendant as one of the persons in the car, but the money order he cashed was one of a series of money orders later found in a white Mustang.

At approximately 8:15 p.m., Highway Patrol Officer Chambers stopped a white Mustang in which defendant and Weatherhead were passengers at a point approximately 15 miles west of Colfax because of a defective taillight. In the back seat of the car were four to seven bags of groceries, one from the D & M Market and one from Raley's. Under the front seat the officers found a wallet containing the Air Force I.D. cards of Charles Ford and George Shoulders and six Travelers money orders on which the amounts had been erased.

Defendant denied involvement in any of the instances of money order cashing. Weatherhead testified that it was he who presented the forged money order at the Bank of America in Sacramento, using Mickens' I.D. card. Weatherhead testified that this was the only money order he ever cashed, specifically denying that he cashed the one in Raley's in Chico and the one in the D & M Market in Colfax, claiming that he had never been in the market at Colfax.

1. *Alleged prejudicial misconduct of the deputy district attorney*

(a) *in attempting to prove an alleged incriminating statement by defendant to a bail bondsman.*

On cross-examination of defendant, the prosecutor asked him if he had not stated to Glenn Holmes, a bail bondsman, among other matters, that while he had cashed the

forged money order in question, he expected to "beat" the charge because the teller who cashed it claimed that the person for whom she cashed the order was 5 feet 8 inches tall, whereas defendant was 6 feet 2 inches. Defendant objected to this question. Thereupon, in the absence of the jury, the prosecutor made an offer to prove that the statement had been made and that he, in good faith, intended to call Holmes. The court overruled the objection. Defendant denied making the statement or having any conversation with Holmes concerning the present charge. In rebuttal, Holmes admitted that he had had a conversation with defendant about the present charge but that defendant had denied guilt and had not made the claimed statement. Holmes also denied telling the prosecutor that defendant had made such a statement. The prosecutor then took the stand and stated that Holmes a week earlier had in fact told him that defendant had made the claimed statement. Defendant moved for a mistrial, which the court denied.

Defendant contends that the prosecutor acted in bad faith because of the testimony of Holmes refuting the prosecutor's version of their conversation, and that in addition the fact that the attorney testified violated the Canons of Professional Ethics.

■ The term "misconduct" when applied to an attorney implies a dishonest act or attempt to persuade the court or jury by deceptive or reprehensible methods. (*People* v. *Crawford,* 253 Cal.App.2d 524, 534 [61 Cal.Rptr. 472]; *People* v. *Asta,* 251 Cal.App.2d 64, 86-87 [59 Cal.Rptr. 206]; *People* v. *Signal,* 249 Cal.App.2d 299, 311 [57 Cal.Rptr. 541].)
■ Bad faith is manifested by an attorney asking questions which he knows to be inadmissible and improper without expectation of answers, or where the question asked of the witness was for the clear purpose of prejudicing the jury against the defendant. (See *People* v. *Wells,* 100 Cal. 459 [34 P. 1078]; *People* v. *Willmurth,* 77 Cal.App.2d 605, 618 [176 P.2d 102].)

■ It cannot be said that the questioning in the case at bench was made in bad faith. Admissions of guilt by a defendant to third parties not acting for the police would be admissible. (Evid. Code, § 1220; see *People* v. *Lee,* 249 Cal. App.2d 234, 245-246 [57 Cal.Rptr. 281].) In addition, evidence of a prior inconsistent statement of defendant would be admissible to impeach the credibility of defendant. (Evid. Code, § 780, subd. (h).) The questioning of defendant regard-

936

ing these statements he was alleged to have made would be proper. (See Evid. Code, § 403.)

Thereafter, despite defendant's denial that he had discussed the present charge with Holmes, Holmes stated that he had. Thus it was not unreasonable for the prosecuting attorney to assume Holmes' testimony regarding defendant's admission of guilt would be the same as the statement that Holmes had made to him the week before. After Holmes testified to the contrary, the prosecuting attorney could attack the credibility of Holmes. (Evid. Code, § 785; Witkin, Cal. Evidence (2d ed. 1966) § 1271, p. 1177. And see, *People* v. *Miller*, 245 Cal.App.2d 112, 135 [53 Cal.Rptr. 720].)

[4] An attorney acting as counsel in a case is competent to testify like any other witness. (*Hotaling* v. *Hotaling*, 187 Cal. 695, 709 [203 P. 745]; *American Trust Co.* v. *Fitzmaurice*, 131 Cal.App.2d 382, 386 [280 P.2d 545].) And a district attorney is not precluded from testifying as to material facts within his knowledge. (*People* v. *Burwell*, 44 Cal.2d 16, 38 [279 P.2d 744], where the prosecuting attorneys testified to extrajudicial statements made by the defendants; approved in *Burwell* v. *Teets*, 245 F.2d 154, 168.)

The claim of a violation of the Canons of Ethics raises no objection to admissibility of the attorney's testimony. (*Romeo* v. *Jumbo Market*, 247 Cal.App.2d 817, 820 [56 Cal.Rptr. 26].) The prosecutor apparently in good faith asked defendant concerning a statement which, if it occurred, would constitute an admission of guilt. On defendant's denial of the conversation, the prosecutor was forced to call Holmes whom he expected to testify that the statement had been made, otherwise the jury could well accuse the prosecutor of making up the story. Then when Holmes, contrary to what he had led the prosecutor to expect, denied that the statement had been made, the prosecutor was in the position of either doing nothing and thereby letting the jury think that he could not be trusted in matters he was bringing before the jury or else testifying in order to rehabilitate his position before the jury.

The only situation in which the action of the prosecutor would have been improper would have been if the prosecutor had been acting in bad faith, having made up out of whole cloth the statement which he claimed Holmes had made to him. The mere fact of Holmes' denial does not in itself prove bad faith on the part of the prosecutor. The judge who observed the prosecutor's demeanor evidently did not believe that the prosecutor acted in bad faith.

It has been held that even the erroneous admission of a defendant's prior inconsistent statements as substantive evidence "does not automatically deprive the defendant of a fair trial, and the conviction will be reversed only in those cases in which prejudice ensued." (*People* v. *Johnson,* (1968) 68 Cal.2d 646, 660 [68 Cal.Rptr. 599, 441 P.2d 111].) Assuming arguendo that there was misconduct, it could not possibly have been prejudicial. This is not a case where the evidence of guilt is closely balanced. The prosecution's case did not depend upon the alleged statement of defendant. He was positively identified by the bank manager as the guilty person on three different occasions—in court, at a lineup, and from police pictures. Although Mrs. Johnson, the bank teller, could not positively identify defendant, she was positive that Weatherhead, who testified for the defense that he was the offender, was not the person who passed the forged money order at her bank. Moreover, Weatherhead's credibility and recollection were impeached by evidence of his felony convictions, contradicted testimony and poor memory. Defendant admitted that he had talked to Weatherhead about the case. This fact suggests possible collusion. Uncontradicted evidence of three similarly related offenses showed defendant's acquaintanceship with the modus operandi of the crime charged. Defendant and his companions were apprehended in an auto in which were found all the necessary implements for crimes strikingly identical with the crimes in question.

We cannot say that the prosecutor was guilty of misconduct.

(b) *Alleged reference to items which court held inadmissible.*

A study of the transcript does not support defendant's contention that the prosecutor's remarks to which defendant now objects actually referred to the items which the court held inadmissible.

The court had ruled that items found in the car's trunk were inadmissible because the officers had failed to get a search warrant before searching the trunk. However. the two military I.D. cards which Officer Chambers found under the front seat were admitted. On direct examination defendant testified that the first time he saw the I.D. cards was "inside the jail house and the policemen went outdoors in the car and said they found these two things and some more things in the trunk of the car." On cross-examination, unfortunately without identifying the objects but apparently referring to the

cards admitted in evidence, the prosecutor asked defendant if he had ever seen "those before." Defendant replied that he had, that the policeman had told him they had obtained them from the trunk of the car. It is apparent that the defendant thought they were talking about the I.D. cards which on direct examination he testified were the objects shown to him by the officer and which he claimed the officer said came from the trunk. Moreover, his counsel evidently thought so, too, as he made no objection to this line of questioning. Judging by counsel's vigilance throughout the trial in protecting defendant's rights, it is reasonable to assume that had he thought the prosecutor was referring to items denied admittance he would have objected.

(c) *Cross-examining defendant concerning his refusal to give exemplars of his handwriting.*

 Sergeant Thayer testified that defendant had refused his request for a handwriting exemplar. Defendant later gave his attorney exemplars which he introduced into evidence. On cross-examination of defendant the prosecutor asked him if his attorney was the only one to whom he had given a handwriting exemplar. He stated that he was and that he gave it because he, defendant, knew he was not guilty. No objection was made to the prosecutor's question. Then the latter asked why if defendant was not guilty he didn't give an exemplar to the officer who asked for it. Objection was made and sustained. The prosecutor then asked, "Would you have given that handwriting if you would have known these checks in Yuba City would be introduced?" The court sustained defendant's objection. *People* v. *Sesslin* (1968) 68 Cal.2d 418, 428-429 [67 Cal.Rptr. 409, 439 P.2d 321], holds that "the rendition of exemplars does not amount to self-incrimination within the meaning of the Fifth Amendment" and that warnings are not required to be given by police officers in demanding handwriting exemplars in a case where handwriting is an issue. In *People* v. *Graves* (1966) 64 Cal.2d 208, 210 [49 Cal.Rptr. 386, 411 P.2d 114], the court held admissible handwriting exemplars obtained by the police after the defendant had been in custody three or four days. There appears to be no good reason why requiring such exemplars would violate the privilege against self-incrimination any more than fingerprinting, photographing, and measuring a defendant without his consent, requiring him to stand up in court for identification or to try on items of clothing without his consent or obtaining blood samples without his consent, all

of which the courts have held may be done and are not violations of the privilege against self-incrimination. (*People* v. *Graves, supra,* 64 Cal.2d at p. 214.) The footnotes in *Graves,* pages 210-211, are applicable here: "Not every aid that a defendant or suspect is required to give the prosecution violates the privilege against self-incrimination. A defendant may be ordered to stand up in court for identification, or to try on items of clothing. [Citations.] Blood samples may be taken from a suspect without his consent, if the means used to obtain them do not shock the conscience. [Citation.] Although we have found no case in which an unwilling defendant who has not waived the privilege has been ordered to give handwriting exemplars, statements in some California cases and the opinions of leading writers support the position that the privilege is not applicable. [Citations.]

" 'Handwriting identification is based upon the principle that every person's handwriting is distinctive. . . . The possibility that one person could imitate the handwriting of another and successfully deceive an expert document examiner is very remote.' "

In *People* v. *Ellis* (1966) 65 Cal.2d 529 [55 Cal.Rptr. 385, 421 P.2d 393], it was held that a defendant's refusal to "display his voice" was "circumstantial evidence of consciousness of guilt" (pp. 536, 537). In *People* v. *Sudduth* (1966) 65 Cal.2d 543, 546 [55 Cal.Rptr. 393, 421 P.2d 401], the court held that a defendant had no constitutional right to refuse to comply with certain requested physical tests such as walking a straight line, and to submit to the breath test for alcoholic absorption, and that the prosecutor had the right to comment to the jury on defendant's refusal to comply. It would seem that a refusal to give a handwriting exemplar is in the same category as the matters above related.

But even if the questions concerning defendant's refusal to give exemplars were deemed improper, a reversal is not warranted for defendant's guilt was substantially proved, and it is not reasonably possible that a result more favorable to defendant would have been reached in the absence of such questions.

2. *No counsel at lineups.*

■ There was testimony that some of the witnesses identified defendant at lineups. Defendant's attorney was not present at any of them. *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v.

*California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], hold that a defendant has a constitutional right to have counsel present at a lineup. *People* v. *Feggans* (1967) 67 Cal. 2d 444 [62 Cal.Rptr. 419, 432 P.2d 21], holds that the rule requiring exclusion of identification evidence obtained at a police lineup at which the accused did not have the assistance of counsel is restricted to lineups occurring after June 12, 1967. (Accord, *People* v. *Harris* (1967) 67 Cal.2d 866, 872 [84 Cal.Rptr. 313, 434 P.2d 609].) Defendant seems to have confused this ruling as applying to *trials* rather than *lineups* occurring subsequent to June 12, 1967. This case was not tried until August 1967. However, all the lineups testified to occurred before that date. In *People* v. *Harris, supra,* at page 872, it was held that if the lineups were so necessarily suggestive and conducive to irreparable mistaken identification, testimony concerning them would have to be ruled out. Defendant makes no specific allegation that the lineups were unfairly conducted. Defense counsel extensively questioned the lineup witnesses and no evidence was elicited indicating that the lineups were not fairly conducted.

3. *Alleged ineffectiveness of counsel.*

The foregoing contentions were made by defendant's counsel on this appeal. Additionally, defendant was given permission to file a supplementary brief. Other than making the bold assertion that he could not possibly have been guilty of forgery, he makes no attack on the sufficiency of the evidence, and no specification of any failure of proof.

■ Defendant makes broad general statements of inadequacy of his counsel, the public defender. His specifications that he was ineffectively represented by counsel are based on the claims that counsel made no attempt to consult or subpoena witnesses material to his defense; failed to make a preliminary investigation of the facts and to adequately prepare his defense. Defendant further claims that the incompetency of counsel is further manifested by the fact that he misled his only witness, Weatherhead, regarding the date Weatherhead purportedly committed the act defendant was charged with; that he failed to make timely motions and objections, and it was counsel's incompetence which resulted in the court's improperly ruling that the search of the vehicle was legal.

There is clearly no merit to any of defendant's claims. It is apparent from the record that defendant's trial was not reduced to a "farce or a sham." (*People* v. *Ibarra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) The public

defender represented defendant in a most conscientious and competent manner with regard to his making objections and in the cross-examination of the prosecution's witnesses. The question as to whether to call certain witnesses is a matter of trial strategy; here defendant has failed to show that any witness in fact existed who was not allowed to testify. (See, *People* v. *Ferguson,* 261 Cal.App.2d 807, 810-811 [68 Cal.Rptr. 431]; *People* v. *Tomita,* 260 Cal.App.2d 88, 93-94 [66 Cal.Rptr. 739].)

4. *Other contentions of defendant.*

One is that he was denied a speedy trial. This seems to be based upon the fact that 25 days elapsed between the filing of the complaint and the filing of the information, defendant contending that an information must be filed within 15 days of the filing of the complaint. There is no requirement that the information be filed within 15 days of the filing of the complaint. The information must be filed within 15 days of his being held to answer (the preliminary examination) (Pen. Code, § 1382). He was held to answer on June 2, 1967, and the information was filed on June 16, well within the 15-day period.

Other alleged irregularities defendant complains of in general terms relating to matters occurring prior to the filing of the information, such as dismissal of the first complaint and filing another, are not a part of the record on this appeal. However, they do not appear to be of merit.

Little argument is advanced in support of defendant's next contention, that the evidence—the two military identification cards and the six Traveler's Express money orders—were the product of an illegal search and seizure. Apparently defendant is claiming that the officer had no probable cause to search the car when it was stopped as he claims only for a traffic violation.

Highway Patrol Officer Charles Chambers testified that the principal reason for stopping the car was that they had received two different radio calls—one from the Grass Valley sheriff's office advising them that three persons in a white Mustang with a corresponding license number had attempted to pass checks in Grass Valley and were enroute from Grass Valley to the Auburn area; the second was from the Colfax Police Department stating that the vehicle was now westbound on Interstate 80 from Colfax, that one of the occupants was wanted and possibly armed. An additional reason for stopping the car was that the right rear taillight was defective.

After stopping the car, the officers placed the driver Jamison under arrest for not having a driver's license, carrying an open bottle of liquor, and for having a defective taillight. Before leaving the car to go to the Placer County jail, the officers searched the car because as they were stopping it they observed obvious activity in the car. They found the items introduced in evidence under the front seat. After the car was impounded the officers inventoried the items in the trunk, but the court sustained defendant's objection that this search was illegal. Since the evidence establishes that there was probable cause to stop the vehicle, the search of the vehicle conducted at the scene as an incident to the arrest of Jamison would be legal.

Judgment affirmed.

Friedman, Acting P.J., and Regan, J., concurred.

A petition for a rehearing was denied November 27, 1968, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied December 24, 1968.