[Crim. No. 1662. Fifth Dist. Dec. 16, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
JEROME WALLACE DORSEY, Defendant and Appellant.

954

**COUNSEL**

James L. Rankin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Robert D. Marshall and Kevin M. Corrington, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FRANSON, J.**—Appeal from judgments of conviction of two counts of violation of Penal Code section 476a (insufficient fund checks). Walter Osborn, Jr., Judge. Affirmed.

Because appellant does not challenge the sufficiency of the evidence to support the convictions, we will recite only those facts necessary to the issues raised.

In January of 1973, appellant made two purchases at the Sears store near Bakersfield, paying for both of the purchases by personal check. The first purchase of a set of radial tires was made on January 27, 1973,

through a Sears clerk named Miss Look, who testified that appellant wrote a check in the amount of $314.22 in her presence. She said appellant did not say anything to her about not having any credit arrangements with his bank. Miss Look identified a check, People's Exhibit 1, as the check appellant gave her, and she identified appellant as the man who gave her the check.

The second purchase from Sears occurred the following day, January 28, 1973, when appellant bought an electric typewriter from a Sears clerk named Linda Adams. Miss Adams testified that appellant gave her a personal check for $263.45. She identified People's Exhibit 2 as the check appellant gave her. Miss Adams said that appellant said nothing to her about the possibility that there might be insufficient funds in his account to cover the check.

Evidence of appellant passing three other bad checks at the Sears store between November 28, 1972, and December 16, 1972, was also introduced.

Mr. Bryant, the assistant security manager at the Sears store who had the responsibility of following up on bad checks passed to Sears, stated that he was aware of several problem checks passed at Sears by appellant. Two of these checks, People's Exhibit Nos. 1 and 2, upon which counts I and II of the information were based, were returned, stamped "account closed." The other checks were returned, stamped "not sufficient funds." Bryant also reported receiving a letter from appellant about December 26, 1972, in which appellant apologized about the bad checks, said they were the result of a domestic problem, said he also had about a dozen checks out to other stores, and said he would make partial payments until everyone was satisfied. He also stated in the letter, "I guess I could go to jail. That is your prerogative; however, then nobody would get paid." Bryant said that in accordance with Sears' normal procedure, a letter and a mailgram should have been sent to appellant asking him to come in and make arrangements to take care of his checks, but he did not know of his own knowledge whether or not this was actually done.

The Sears security manager, Thomas S. Knight, testified that he had had a conversation with appellant wherein he told appellant he would have to go to the police with the checks unless appellant covered them immediately. Appellant did not cover the checks and Knight went to the police about two weeks after this conversation.

Harry Rubin, the operator of a pawn shop in Bakersfield, testified that appellant pawned his newly purchased Sears electric typewriter at Rubin's pawn shop on February 12, 1973, for $25.

Lawrence Putnam, the operations officer of the American National Bank where appellant had his joint checking account with his wife, testified that he was the custodian of the bank's records and that all the records involved were kept in the normal course of business. Testifying from his records, Putnam stated that appellant and his wife opened their checking account on October 3, 1972, and that bank records indicated that the bank had closed the account on January 18, 1973, at which time it was overdrawn $150.18. Putnam stated that the bank closed the account because of numerous insufficient fund items presented and because no deposits had been made after December 4, 1972.

According to Putnam, it was the bank's policy to mail a notice to the holders of the account whenever the bank closed an account but he could not state from his own knowledge that such a letter was sent to appellant. Putnam testified that the bank's records showed that some 46 items went through the bank's computer on appellant's account between November 30, 1972, and January 18, 1973, that were rejected due to insufficient funds, but that this did not necessarily mean 46 separate overdrawn checks because individual checks might be put through several times before being marked in such a way that the computer would not accept them.

Mr. Putnam also testified that in normal practice an account holder would be notified by mail each time a check was presented on his account for which there were insufficient funds to cover the check. He could not say of his own knowledge, however, that this had been done with regard to appellant's account. During cross-examination, Mr. Putnam identified an American National Bank form letter addressed to appellant and dated January 18, 1973, the date the bank closed his account, as being a standard bank form letter. (Defendant's Exhibit A.) The letter stated that appellant's account was overdrawn in the amount of $150.18 and requested that he check his records and, if the bank was correct, promptly make a deposit to cover the overdraft. The letter made no mention of closing the account. Mr. Putnam could not explain the sending of Defendant's Exhibit A to appellant, and admitted that the postage-meter stamp number on the envelope of Defendant's Exhibit A was the bank's postage-meter number.

Bakersfield Police Detective Strellich testified that he arrested appellant for the crimes charged in this action on February 16, 1973, and that after advising appellant of his constitutional rights, he discussed the crime with him. Strellich said he showed appellant the two Sears checks upon which this case is based and asked appellant if he had not issued the checks with the intent to defraud Sears, knowing that he did not have sufficient funds in his account to cover them. Appellant's reply, according to Strellich, was, "yes." Strellich testified further that during his postarrest conference with appellant, he showed appellant the letter to Sears apologizing for the several "insufficient funds" checks; appellant admitted having written it and said he had a number of other checks out, primarily at liquor stores.

Kern County Deputy Sheriff Nagel testified that while standing guard over appellant and several other prisoners who were sitting in a courtroom awaiting their pretrial hearings, he overheard appellant say to a fellow prisoner, "I'm guilty as hell but I'm not going to make any deals. They're going to have to prove it. They're going to have to work for it." Nagel said he noted appellant's name when he was called for his pretrial hearing and then wrote a note relating what he had heard and gave it to a deputy district attorney that same day.

## DISCUSSION

Appellant contends that it was prejudicial error to receive the testimony of Mr. Putnam, the operations officer of the American National Bank, concerning the bank's records of appellant's account. He first argues that Putnam's testimony was inadmissible because the records from which he testified were never offered into evidence so that his testimony violated the best-evidence rule. (Evid. Code, § 1500.) However, no objection was made that the testimony violated the best-evidence rule; the only objection being that the testimony was hearsay because an insufficient foundation had been laid for the admission of the testimony under the business records exception to the hearsay rule. (Evid. Code, § 1271.)

The failure to state the *specific ground* upon which an objection rests waives appellate review of the objection. (Evid. Code, § 353, subd. (a).) Appellant now may not complain that the testimony violated the best-evidence rule.

Appellant's contention that no proper foundation was laid as

required under the business records exception[1] to the hearsay rule is without merit. Putnam brought to court the following records: appellant's signature card, the monthly statements from the date the account was opened until it was closed, and copies of several overdraft or "NSF" notices that presumably were mailed by the bank to appellant each time an overdraft or NSF check had been presented for payment. Putnam testified that these records were kept by the bank in the regular course of its business. When he attempted to testify as to the contents of the records, appellant's trial counsel objected on the grounds that his testimony would be "hearsay." Thereupon, the prosecutor again established that the records were kept by the bank in the regular course of its business; that Putnam was the custodian of the records; that a part of his duties "is keeping the open as well as the closed records of the bank." Over a continuing hearsay objection because of "no foundation," the trial court permitted Putnam to testify from the records.

Again, we observe that, before an appellate court will give consideration to an objection to evidence, the *specific ground* for its exclusion must have been clearly stated to the trial court. (Evid. Code, § 353, subd. (a).) ■ This is particularly true where, as in the instant case, the objection easily could have been cured by the party offering the testimony if the specific reason for the objection had been stated to the trial court. (See *People* v. *Fowzer,* 127 Cal.App.2d 742, 746-747 [274 P.2d 471].) The only apparent defect in the foundation required by Evidence Code section 1271 was in the failure of Putnam to testify as to the mode and time of preparation of the bank statements. This oversight obviously could have been remedied if appellant's counsel had objected on that specific ground; his failure to do so should prevent his asserting this ground on appeal.

Moreover, we believe that bank statements prepared in the regular course of banking business and in accordance with banking regulations are in a different category than the ordinary business and financial records of a private enterprise. It is common knowledge that bank statements on checking accounts are prepared *daily* and that they consist of debit and credit entries based on the deposits received, the checks written and the service charges to the account. We fail to see where

---

[1]Evidence Code section 1271 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule . . . if:

"(a) The writing was made in the regular course of a business;

"(b) The writing was made at or near the time of the act, condition, or event;

"(c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and

"(d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

appellant has been prejudiced by the absence of testimony as to the "method" of preparation of the records, i.e., whether by hand or by computer and from what sources. Such testimony would not have a bearing on the basic trustworthiness of the records. While mistakes are often made in the entries on bank statements, such matters may be developed on cross-examination and should not affect the admissibility of the statement itself.

■ A trial judge has broad discretion in admitting business records under Evidence Code section 1271, and it has been held that the foundation requirements may be inferred from the circumstances. Indeed, it is presumed in the preparation of the records not only that the regular course of business is followed but that the books and papers of the business truly reflect the facts set forth in the records brought to court. (See *People* v. *Fowzer, supra,* 127 Cal.App.2d 742, 747-748; accord *People* v. *Schmidt,* 147 Cal.App.2d 222, 231-232 [305 P.2d 215].)

Appellant's reliance on *Gee* v. *Timineri,* 248 Cal.App.2d 139 [56 Cal.Rptr. 211], *Pruett* v. *Burr,* 118 Cal.App.2d 188 [257 P.2d 690] and *Transport Indemnity Company* v. *Seib,* 178 Neb. 253 [132 N.W.2d 871, 11 A.L.R.3d 1368] is misplaced. In *Timineri,* the record in question was a financial statement of a private business offered to show commissions earned, and prepared by a bookkeeper from the records in the office. In *Pruett,* the business records were documents relating to a chemical analysis, and in *Transport Indemnity Company,* the records were computer-taped calculations regarding insurance premiums. In these cases, the mode and time of preparation of the records clearly would be relevant to their basic trustworthiness and, hence, their admissibility.

■ Finally, even if the admission of Putnam's testimony was error, our review of the record convinces us that it was not prejudicial to appellant. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) Apart from Putnam's testimony, there was sufficient proof of the corpus delicti of the crimes to permit the introduction into evidence of appellant's confession to Officer Strellich and his admission of guilt in the presence of Deputy Nagel.

■ Generally speaking, the corpus delicti of a crime is (1) the fact of the loss or harm, and (2) the existence of a *criminal agency* as its cause. (1 Witkin, Cal. Crimes, § 88, pp. 84-85.) The identity of the person committing the crime is not a part of the corpus delicti, thus, the fact that the defendant was the person who committed the crime may be established by his admission or confession. (See *People* v. *Cullen,* 37

Cal.2d 614, 624 [234 P.2d 1]; *People* v. *Garcia,* 101 Cal.App.213, 216-217 [281 P. 508].)

■ Moreover, proof of the corpus delicti need not be established beyond a reasonable doubt; slight evidence or a prima facie case as to each element of the offense suffices to carry the prosecution's burden. (*People* v. *Cullen, supra,* 37 Cal.2d 614, 624.) ■ Also, the corpus delicti may be established by circumstantial evidence alone. (*People* v. *Bolinski,* 260 Cal.App.2d 705, 714-715 [67 Cal.Rptr. 347]; 1 Witkin, Cal. Crimes, § 91, pp. 87-88.)

■ In this case, proof that the checks were drawn on an account after it was closed, together with evidence of a series of other "insufficient funds" checks, is sufficient evidence to permit an inference of a loss or harm to Sears by a criminal agency, i.e., that the drawer of the checks knew at the time they were written that there were insufficient funds in the bank to cover the checks.

Miss Look, the Sears clerk, testified that she was told that the check appellant wrote her for the set of radial tires had been returned for insufficient funds. Mr. Bryant, the assistant security manager at Sears, testified that the checks constituting counts I and II of the information were returned from the bank stamped "account closed" and that the other checks given by appellant to Sears were returned from the bank stamped "not sufficient funds." Bryant also testified that when he received the first "account closed" check he contacted the bank and found that it had been written *after* the account was closed. Mr. Rubin, the pawn shop owner, testified that on February 12, 1973, the appellant pawned the typewriter purchased at Sears for $25. Appellant's failure to return the typewriter to Sears permits an inference that he intended to defraud Sears when he purchased the typewriter on January 28 for $263.45.

Thus, even if admission of Putnam's testimony as to the contents of the bank records was error, there was sufficient other proof of the corpus delicti so that the confession was admissible.

Appellant next contends that a mistrial should have been granted on grounds of prejudicial misconduct of the prosecutor.

During the direct examination of Mr. Bryant, the Sears assistant security manager, the prosecutor asked whether he had become aware of certain checks of appellant's and how many he was aware of. Upon

objection, the prosecutor made an offer of proof out of the presence of the jury that Bryant had seen 12 of appellant's checks and had turned them all over to Officer Strellich. At this point in the trial, five of the checks had been marked for identification, People's Exhibits 1 through 5. After a discussion as to whether a proper foundation could be laid for the other seven checks, the prosecutor said he would refer only to the five checks already identified. The judge agreed, saying, "Let's stay away from the number twelve."

Later, in the direct examination of Officer Strellich by the prosecutor, the following occurred:

"Q. [D]id you have occasion to receive a letter allegedly written by Mr. Dorsey from the Sears security people?

"A. Yes, sir, I did . . .

"Q. And did you also receive other items from Sears security on February 15th, 1973?

"A. Yes, sir, I did.

"Q. What were those items?

"A. A total of twelve checks on the account of a Jerome W. Dorsey . . ."

Strellich, the prosecutor's investigating officer, apparently was present throughout the trial including the discussion about avoiding the mention of the number 12.

Appellant immediately objected and moved for a mistrial based on the prosecutor's misconduct in asking such a broad question in light of the previous ruling of the court. The prosecutor argued that the answer was not prejudicial because Strellich would also testify that appellant had told him that he had passed various checks at Sears, and because of the prior testimony of the bank officer that 46 insufficient funds items had gone through the bank's computer on appellant's account.

The trial court denied the motion for a mistrial, stating that it was "awfully close to a mistrial but not quite close enough." The jury was then recalled and admonished to strike the number 12 from their minds.

Later, after a letter was read into the record without objection in which appellant had written to Sears admitting that he had several overdrawn checks out to Sears and about a dozen other bad checks out to other stores and stating, "I guess I could go to jail . . . however, then nobody would get paid," the trial judge informed appellant in chambers that he did not believe that the case was as close to a mistrial as he had originally thought when he ruled on the motion for mistrial.

■ Misconduct is defined as a dishonest act or attempt to persuade the court or the jury by the use of deception or reprehensible methods. ■ The burden of proof is on the defendant to show misconduct. (*People* v. *Rhinehart,* 9 Cal.3d 139, 154 [107 Cal.Rptr. 34, 507 P.2d 642].) ■ Bad faith is manifested by an attorney asking questions which he knows to be inadmissible and improper, or where the question asked was for the clear purpose of prejudicing the jury against the defendant. (*People* v. *Stokley,* 266 Cal.App.2d 930, 935 [72 Cal.Rptr. 513].)

It does not appear that the prosecutor was acting in bad faith. However, even assuming the direct examination of Officer Strellich by the prosecutor was in bad faith, it is not a ground for reversal if there is no reasonable probability that it contributed to the verdict. (*People* v. *Watson, supra;* 46 Cal.2d 818, 836; *People* v. *Fusaro,* 18 Cal.App.3d 877, 886-887 [96 Cal.Rptr. 368].)

Here, the jury was admonished not to consider the "number twelve." Considering also the other evidence of appellant's guilt, in particular his letter to Sears in which he admitted having several checks that were outstanding to Sears and about a dozen to other stores several weeks before he wrote the checks for which he was prosecuted, we conclude that the answer given by Strellich was not prejudicial. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

Appellant's final contention is that the trial judge committed prejudicial error in the method used for *voir dire* examination of the jurors. The trial judge's *voir dire* of prospective jurors was as follows.

Twelve prospective jurors were seated in the jury box. The trial judge addressed his remarks to them as a group, but he also instructed the entire panel to listen carefully to the instructions and questions because if they were called, they would have to indicate if their answers to the questions that had been asked would be the same.

The trial judge first instructed the prospective jurors on questions of fact and law, the presumption of innocence, the standard of reasonable doubt, standards for judging the credibility of witnesses, and that they could consider solely evidence presented during the trial.

He then questioned the 12 en masse, taking silence to be the negative or affirmative answer called for, as to whether they could follow the law, whether they knew the defendant, either counsel, anyone from the district attorney's or public defender's offices or any of the proposed witnesses, whether they had friends or family in law enforcement, if they had any legal training or had ever served on a jury, if they had ever brought charges against someone for passing a bad check, whether they could try this type of case fairly, whether the fact that the defendant had been charged would prejudice them against him, and whether they would like to be judged by 12 jurors like themselves. Several of the questions brought responses from individual jurors and in each instance the trial judge explored the effect on the juror's impartiality.

The judge then asked the 12 jurors individually their name, marital status, occupations of themselves and their spouses, and the number of children, if any. He stressed that the court needed to know if they had worked within the last five years for the district attorney, sheriff, or public defender.

During a recess, defense counsel professed surprise at, and objected to, the en masse *voir dire* of the panel by the trial judge. The court then asked for and received about 15 additional questions from both sides to be asked of the prospective jurors. When the court put those questions to the 12 prospective jurors, 7 jurors responded and were questioned further by the court. At several intervals thereafter, the court accepted additional questions from defense counsel, e.g., whether evidence of excessive drinking by defendant would prejudice the jurors and whether the individual jurors drank alcoholic beverages. There were numerous individual responses from the jurors to these questions.

At the completion of this questioning defense counsel exercised his first peremptory challenge. Thereafter, as each new prospective juror was called, the judge conducted some questioning but allowed counsel for each side to conduct most of the remaining *voir dire.*

When all of appellant's peremptory challenges had been exercised, his counsel requested and was denied additional peremptories; he reasserted his objection to the en masse questioning of the first 12 prospective

jurors, pointing out that he had not heard individually from 7 of the panel as finally constituted, and he said he would exercise additional peremptories if they had been granted.

Appellant contends that *People* v. *Crowe,* 8 Cal.3d 815 [106 Cal.Rptr. 369, 506 P.2d 193], does not authorize collective *voir dire* of prospective jurors by the trial judge and that such a method is impermissible under earlier case law.

Although the prospective jurors in *Crowe* were questioned individually by the trial judge, we do not read that decision as expressing disapproval of the method of *voir dire* used by the trial judge in the instant case. "To the contrary, the cases construing section 1078 illustrate that the court will uphold *any method of voir dire* which results in reasonable examination of prospective jurors. . . ." (*People* v. *Crowe, supra,* 8 Cal.3d at p. 821; italics added.)

■ Collective *voir dire* of the jury panel by the trial judge does not violate Penal Code section 1078. (*People* v. *Casserio,* 16 Cal.App.2d 223, 227 [60 P.2d 505]; cited with approval in *People* v. *Crowe, supra,* 8 Cal.3d, p. 828, fn. 22, and in *Rousseau* v. *West Coast House Movers,* 256 Cal.App.2d 878, 886 [64 Cal.Rptr. 655].) It is the duty of the trial judge to restrict the examination of the jurors within reasonable bounds so as to expedite the trial. (*People* v. *Crowe, supra,* at p. 828, fn. 22.)

The record establishes that the method of *voir dire* used herein resulted in the selection of a fair and impartial jury and afforded counsel the right of reasonable examination of prospective jurors, including some individual *voir dire.* We find no abuse of discretion by the trial judge.

The judgments of conviction are affirmed.

Brown (G. A.), P. J., and Gargano, J., concurred.