[Crim. No. 14832. First Dist., Div. Two. Dec. 19, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
GUST D. MAZOROS, Defendant and Appellant.

## COUNSEL

Singer & Osterhoudt, Harry C. Singer, William L. Osterhoudt, Stephen J. Heiser and Janice M. Lagerlof for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Jerome C. Utz and Franklin D. Elia, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TAYLOR, P. J.**—Defendant appeals[1] from a judgment of conviction entered on a jury verdict finding him guilty of grand theft, in violation of Penal Code section 484. He contends that: 1) the court abused its discretion in refusing him a reasonable continuance and thereby forcing him to stand trial in the face of uncontradicted testimony that his physical and mental condition precluded him from being fully present and participating in his defense; 2) the court erred in permitting a court appointed psychiatrist to examine him and determine his competence to stand trial, and then permitting the psychiatrist to testify for the

---

[1]The notice of appeal erroneously indicates that it is taken from the verdict and sentence as well as from the judgment.

prosecution about the examination; 3) the court erred to his prejudice by admitting, over his objection, evidence concerning the nonexistence of a bank in the Bahamas, whose checks figure significantly in the corporate financial transaction that was the basis of the prosecution; and 4) the prosecutor committed prejudicial misconduct by his repeated references to other unproved charges, in commenting on his failure to testify, and failing to comply with the court's repeated admonitions. For the reasons set forth below, we have concluded that there is no merit to any of these contentions and that the judgment of conviction must be affirmed.

As there are no contentions concerning the sufficiency of the evidence, a summary of the pertinent facts, viewed in the light most strongly in favor of the judgment, will suffice.

On May 31, 1974, defendant purchased two blocks of shares in the Mortgage Loan Services Corporation (MLSC), in Palo Alto and was thereafter voted president of the corporation. MLSC had a trust account in which investors' monies were held at the Union Bank in San Jose.

At this time, Otis Scoggin and two of his associates were seeking a loan for their corporation (CSF) in Nevada to develop the Kings Inn Casino in Reno. On May 23, 1974, defendant gave CSF a letter of commitment for a loan of $325,000 and also informed CSF that he would undertake to secure for it a loan of $6 million, in which the $325,000 loan would be incorporated. CSF requested an advance of $75,000 on the $325,000 loan as CSF was going to post that amount with the Nevada Gaming Commission. On May 29, 1974, defendant signed a promissory note for $75,000 in the office of Scoggin's attorney.

On May 30, 1974, defendant, acting as the president of MLSC, informed Union Bank that he intended to close the old trust account as he was not an authorized signatory, and that he planned to open a new trust account. Defendant then instructed MLSC's bookkeeper to "Please have Bill and Bob sign three checks on each of the accounts in Union." These three checks were blank; Bill and Bob were the authorized signatories of the old trust account at Union Bank. Defendant's note was received on June 3, 1974, and the checks were signed in blank as he had requested.

The next day, June 4, 1974, defendant went to Union Bank and formally closed the old trust account. Thereafter, acting as the president of MLSC, defendant had the funds transferred to the new account for

which he was an authorized signatory. After the balance had been transferred to the new account, defendant instructed the bank to issue him a cashier's check in the amount of $85,029.30, payable to the First National Bank of Nevada.

Later that day, defendant met with the officers of CSF in Reno and proceeded to the First National Bank of Nevada. There, defendant presented the above mentioned cashier's check in the amount of $85,029.30 and in exchange instructed the Nevada bank to issue him a cashier's check for $75,000. Defendant gave the cashier's check to CSF and deposited the remaining $10,029.30 in his personal account in Elko, Nevada.

Defendant then told CSF that he was going to the Bahamas to obtain the $6 million loan for CSF. CSF promised defendant a $100,000 loan fee if he was able to secure the loan. On June 10, 1974, CSF received a letter of commitment for the $6 million from a bank in Freeport. CSF then issued two checks for $100,000 each to defendant. Both were returned for insufficient funds by the bank since the $6 million from which the $100,000 was to be withdrawn was never received by CSF. The very existence of the Freeport bank was in question. However CSF advanced defendant an additional $18,000 for travel expenses.

About 10 days after the blank checks had been signed as instructed by defendant, MLSC discovered a serious shortage in its trust account. Defendant acted without express or implied permission to withdraw funds from the trust account. In signing the three blank checks, the other officers of MLSC were told that this was merely a transferring of funds from the old to the new trust account. Subsequently, MLSC went into receivership. During this entire period of time after defendant assumed the presidency of MLSC and negotiated loans without authority with CSF, each person with whom he dealt indicated that defendant seemed normal and was not acting as if he were under the influence of either drugs or alcohol.

The defense was that defendant in mid-1974 was acting under diminished capacity caused by his use of numerous drugs prescribed[2] for his heart condition. In rebuttal, the People presented: 1) additional testimony that defendant was acting in a normal fashion with no detectable sign of being under the influence of either drugs or alcohol; and 2) psychiatric testimony indicating that defendant did not have

---

[2]Dalmane, percodan, stelozine, nitroglycerine and valium.

diminished capacity but had the mental capacity to do whatever he intended to do. Defendant's own expert indicated that in addition to the drugs mentioned, defendant consumed about one-fifth to a quart of hard liquor per day and that this amount of alcohol, added to the prescribed drugs, would have a depressant effect on defendant's brain and functioning. Defendant's expert opined that defendant was not insane and was capable of standing trial, but suffered from diminished capacity at the time of the charged offense.

Defendant first contends on appeal that the trial court abused its discretion in denying his motion for reconsideration of its denial the previous day of a defense motion for a three to six month continuance. Defendant asserts that he was forced to go to trial in the face of uncontradicted testimony that his physical and mental condition prevented him from being "present" at the trial and participating in his defense. As the transcript pertaining to this portion of the proceedings was inadvertently lost or destroyed, the parties have prepared an agreed statement of facts,[3] as follows:

Dr. Stephens, as an expert in heart and lung diseases, indicated that defendant had been a patient of his since 1967. In 1971, after complaints of severe chest pains, Dr. Stephens diagnosed defendant's condition as angina pectoris, compounded by conditions of stress and anxiety and that although each victim of this disease responded to different stimuli, once the triggering mechanism occurred, it could result in fatality. In defendant's particular circumstances, Dr. Stephens opined that the rigors of a trial would be extremely dangerous and that there would be a substantial likelihood of a fatal heart attack unless defendant was sedated with large doses of valium or some similar medication. However, in order to accomplish this sedative effect, defendant's intellectual functions might be impaired so as to cause him to be unable to adequately communicate with his counsel and fully comprehend the proceedings.

On cross-examination, Dr. Stephens testified that an electrocardiogram performed on defendant in 1971 was nonspecific but compatible with a heart ailment. Dr. Stephens' diagnosis was based primarily on the subjective manifestations and feelings conveyed to him by defendant. Dr. Stephens left it to the patient to "tell him what bothers him and what doesn't bother him." Dr. Stephens did not believe defendant was

---

[3] California Rules of Court, rules 7(a) and 36(b).

exaggerating and referred him to a prominent heart specialist at a clinic in Ohio. A report dated November 2, 1971, sent to Dr. Stephens by the clinic stated in part that Dr. Proudfit did not think from a clinical standpoint that defendant's symptoms were due to coronary artery disease but certainly agreed that coronary arteriography was indicated because of the possibility of such a condition.[4] The report also indicated that defendant's coronary disease was of a sufficient severity to cause significant symptoms and recommended some changes in medication, as well as weight reduction and a supervised exercise program.

Dr. Stephens felt that defendant should not engage in any court action but had no knowledge as to a pending civil suit in Nevada filed by defendant. Dr. Stephens admitted that defendant's ability to tolerate pain had improved over the years since 1971. Defendant had not been hospitalized at any time during the year preceding the trial and had been relatively free of the Frozen Shoulder Syndrome in recent months. Dr. Stephens further testified that he thought it might be better for defendant to get the trial behind him in order to lessen his anxiety, but he was concerned about the anxiety resulting from defendant's being called as a witness.

Dr. Earl Sumner, a psychologist, after having been qualified as an expert, indicated that he had been treating defendant since 1972 on a referral from the hospital cardiologist who believed there was a link between physical and psychological causes of defendant's heart disease. This correlation is not an uncommon one as many conditions are caused by or complicated by psychological frustration and depression. Dr. Sumner's diagnosis was that defendant suffered from severe anxiety neurosis stemming from his military activities in World War II when he fought with the Italian partisans against Germany after surviving the gunning down of a United States aircraft. This condition was further complicated by defendant's acute vulnerability to any form of interrogation because he had been interrogated by the liberating allied forces who used sodium pentathol.

Dr. Sumner verified the above and the fact that defendant had been granted 100 percent disability from the Veterans Administration Hospital due to his emotional problems.

---

[4] This procedure was carried out October 25 and the films were reviewed by Drs. Schen and Razavi, who concluded that defendant had a coronary disease, but in a relatively mild degree.

Dr. Sumner opined that the court proceedings were a great source of anxiety and that even under heavy medication, if defendant were subjected to cross-examination, he would incur an abnormally high level of anxiety that could place his life in great jeopardy. On cross-examination, Dr. Sumner testified he thought it would be preferable for defendant to get the trial over but the doctor was afraid defendant was unable to stand trial. Dr. Sumner also opined that defendant could entertain the specific intent to steal but could not say that it would be rational. This opinion was not based on objective tests, but upon subjective test knowledge only.

Robert Dunivan, who was then trial counsel, was called to the stand by his associate and examined on behalf of defendant. He testified that defendant had been taking medication and that because of this fact, he was having difficulty communicating with defendant in preparation for trial proceedings.

The prosecution did not call any medical or lay witnesses in opposition but chose to rely solely upon cross-examination. However, none of the witnesses changed their opinions regarding defendant's inability to withstand the rigors of a trial.

█ Whether a defendant has affirmatively demonstrated that justice requires a continuance is a question of fact in the discretion of the trial court and in the absence of a clear abuse of discretion will not be disturbed on appeal (*People* v. *Hisquierdo,* 45 Cal.App.3d 397, 406-407 [119 Cal.Rptr. 378]; *People* v. *Johnson,* 5 Cal.App.3d 844 [85 Cal.Rptr. 238]). This is true even when, as here, the health of the defendant is argued as the grounds for a continuance. The medical reports, contrary to defendant's contention, are not determinative but are merely another factor which the court will evaluate and interpret in reaching its decision. The decision is for the court, not the doctors. (*Agnew* v. *Parks,* 219 Cal.App.2d 696, 702 [33 Cal.Rptr. 465].) Former Penal Code section 1050 provided, so far as pertinent, that "No continuance of a criminal trial shall be granted except upon affirmative proof in open court, upon reasonable notice, that the ends of justice require a continuance."

Defendant here erroneously contends that the "unanimous, uncontra-dicted" medical testimony indicated that he was in danger of suffering a heart attack and would be under heavy sedation throughout his trial. The record, however, clearly demonstrates that the evidence was neither clear

nor uncontradicted. No objective tests supported the medical testimony.[5] For example, Dr. Stephens testified that defendant's heart ailment was nonspecific when tested by an EKG; that the substantial part of his diagnosis was based upon what defendant had told him. An independent test of defendant's condition by the clinic indicated[6] that defendant's condition was "mild" and that it would be better to get the trial over with and thus lessen defendant's anxiety.

Dr. Sumner also indicated that no objective tests had been conducted and that like Dr. Stephens, he relied primarily on what defendant had told him. Dr. Sumner further opined that it would be best for the trial to proceed and thereby lessen defendant's anxiety.

In addition, the relatively mild nature of defendant's heart condition was further shown by the testimony of the doctors during the trial. Dr. Stephens testified that the only medication that could have an effect on defendant's intellectual ability was valium, but that it was only a possibility that this would occur as defendant had been prescribed only 20 milligrams. As to defendant's other psychiatric problems and his fear of interrogation, Dr. Sumner testified ". . . the basic elements are not going to be cured in any way. The state of the art is such as we can't do that."

The record indicates that the court carefully and thoroughly considered all of the medical testimony and then permitted the trial to proceed with defendant's health, safety and interests in mind, and stated "Once you are in it, it isn't that bad, and it is the apprehension that precedes it that is the critical thing, and I think now that we are here and Mr. Mazoros is here and he knows that the trial is going forward, will be concluded in a matter of days, and he will be treated friendly and in a reasonable manner, and if he has any problems all he has to do is advise the court and we will take whatever steps are necessary to ensure that he is not being damaged or injured, and I think that we can conduct a trial and still safeguard his health."

---

[5] Dr. Sumner testified at the trial that there was difficulty in obtaining an electrocardiogram from the defendant because of his muscular tension and that defendant interrupted therapy.

[6] The clinic report also stated that defendant's illness began abruptly one morning when two police officers arrived to question him about some legal transaction in another country.

We can only conclude that the court did not abuse its discretion in denying defendant's motion for a continuance, with the assurance that his welfare and health would be closely safeguarded.

■ Defendant, relying on *Tarantino v. Superior Court*, 48 Cal.App.3d 465 [122 Cal.Rptr. 61], next argues that the trial court erred by permitting its appointed psychiatrist, Dr. Shoor, to testify for the purposes of a Penal Code section 1368 hearing during the People's rebuttal case,[7] and that Dr. Shoor's testimony was based in part on improper or inadmissible matters related to defendant's prior criminal conduct.

We note that *Tarantino, supra,* was decided on May 27, 1975, a few days before the trial of the case at bar, which commenced on June 4, 1975. *People v. Gainer,* 19 Cal.3d 835, 853 [139 Cal.Rptr. 861, 566 P.2d 997], suggests that the benefit of the *Tarantino* rule should not be denied to a pending case like the instant one. *Tarantino* is of no help to defendant here. Tarantino created a "judicially declared immunity" where a psychiatrist initially appointed pursuant to Penal Code section 1367 et seq. is subsequently called to testify during the case in chief. *Tarantino* held that since the original appointment of the psychiatrist is for a determination of defendant's present sanity to stand trial, information obtained by the examination should not be used at trial. However, the court in *Tarantino* expressly qualified its holding in referring to the right to counsel pursuant to Penal Code section 1026, as follows, at page 469: ". . . the presence of counsel at the psychiatric examination is not constitutionally required as long as . . . (2) the court-appointed psychiatrists are not 'permitted to testify at the guilt trial' *unless the defendant places 'his mental condition into issue at the guilt trial'*; and (3) 'if defendant does specifically place his mental condition into issue at the guilt trial,' *and the psychiatrist testifies, the court must instruct the jury* that his 'testimony as to defendant's incriminating statements should not be regarded as proof of the truth of the facts disclosed by such statements,' but 'may be considered only for the limited purpose of showing the information upon which the psychiatrist based his opinion.' "

In the instant case, defendant admittedly and expressly placed his physical and psychiatric condition in issue and thereby waived any alleged privilege (Evid. Code, § 996). Also, the record indicates that the trial court instructed the jury as follows: "There has been admitted in

---

[7]The record indicates that defendant's counsel knew and consented to the presentation of the People's witness on diminished capacity on rebuttal.

evidence the testimony of a medical expert of statements made to him by the defendant in the course of an examination of the defendant which was made for the purpose of diagnosis. The testimony of such statements may be considered by you only for the limited purpose of showing the information upon which the medical expert based his opinion. Such testimony is not to be considered by you as evidence of the truth of the facts disclosed by defendant's statements."

■  The record does not support defendant's contention that Dr. Shoor's testimony was based on any inadmissible or improper matters (Evid. Code, § 780). An expert may base his opinion on matters ". . . made known to him at or before the hearing, whether or not admissible, that [are] of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . ." (Evid. Code, § 801).  ■  In addition, an expert may base his opinion upon information that is itself not in evidence, such as a written inadmissible extrajudicial admission (*People* v. *Conley,* 268 Cal.App.2d 47, 59 [73 Cal.Rptr. 673]).

■  Here, Dr. Shoor had the right to look at all relevant data, including reports of other offenses committed by defendant and police reports[8] in order to make a medically acceptable diagnosis of defendant's psychiatric condition and the People properly could question him as to the basis for his diagnosis. "These were proper foundational matters to aid the jury in the evaluation of the doctor's testimony and were not severable from its medical content without substantially impairing the value of the testimony" (*People* v. *Washington,* 71 Cal.2d 1061, 1082 [80 Cal.Rptr. 567, 458 P.2d 479]).

Dr. Shoor, contradicting Dr. Fort's testimony, indicated that defendant was not suffering from diminished capacity. Dr. Shoor based this opinion on the examination of defendant that he conducted and the other reports he examined as follows: "Q. [by prosecutor]: This other information that you referred to or that you received after this particular report, did it help corroborate your initial opinion. A. Yes. It tended to support my initial clinical interpretation. Q. And what other reports are you referring to? A. . . . Well, this document or some proceedings in another county which indicate Mr. Mazoros was seriously ill and

---

[8]The record indicates that, in fact, these reports were first mentioned by defendant's expert, Dr. Fort, who testified out of order, and also based his opinion, in part, on police reports and similar documents that were furnished to him by defense counsel.

apparently during that same period of time he was out making whatever transactions he was involved in."

Thus, the allusion to the "proceedings" in other counties was made solely for the purpose of explaining the doctor's conclusions about defendant's mental and physical capacity that defendant had himself placed in issue and which defendant's expert, Dr. Fort, had also indicated were the basis of his opinion. Thus, the testimony was properly admitted (*People* v. *Washington, supra,* p. 1081). In addition, the record indicates that the court so cautioned and instructed the jury, and explained that these matters were accusations that could not be considered as evidence of guilt.

Finally, even assuming, without conceding, that the court erred in allowing Dr. Shoor's above testimony, the error was not prejudicial in view of the overwhelming evidence of guilt. ▮ As stated in *People* v. *Duran,* 269 Cal.App.2d 112, 118 [74 Cal.Rptr. 459]: " 'Improper evidence of prior offenses results in reversal only where the appellate court's review of the trial record reveals a closely balanced state of the evidence. . . . The same error, viewed in the light of a record which points convincingly to guilt, is consistently regarded as nonprejudicial. . . .' " We can conclude there was no error in permitting Dr. Shoor to testify that reports of other offenses were part of the basis of his diagnosis. In any event, any potential error was not prejudicial in light of the overwhelming weight of evidence of defendant's guilt (*People* v. *Watson,* 46 Cal.2d 818, 835 [299 P.2d 243]).

▮ Defendant next complains of the court's admission of the testimony of Mr. Scoggin as to the Freeport, Bahamas bank. The record indicates that Scoggin, a witness for the People, first related some of the details of the CSF loan transaction and indicated that in June 1974, he believed the Freeport bank existed; otherwise, he would not have dealt with defendant. Thereafter, Scoggin was permitted to testify that after his lawyer told him that the Freeport bank was not in existence, he ceased doing business with defendant in July 1974. While the statement was hearsay, the court admitted it for the limited purpose of indicating Scoggin's state of mind and in ceasing to do business with defendant.

Subsequently, defendant's son George, who worked with him, testified that he had been to the bank in Freeport and met Mr. Weinstein, who signed the CSF loan commitment letter. When asked by the People whether he was aware that the bank had ceased to exist, George replied

negatively.[9] Thus, the fact that the bank subsequently may have ceased to exist had little bearing on its status at the time of the transaction in June 1974. The question of the existence of the bank at the time of the transaction was properly left to the jury to determine on the basis of the conflicting inferences that could be drawn from the above summarized testimony. We think the evidence was properly admitted for the limited purpose of indicating Scoggin's state of mind when he ceased to do business with defendant in July 1974. Even assuming an error, it could not be prejudicial under the applicable standard of *People* v. *Watson,* 46 Cal.2d 818, 835 [299 P.2d 243].

Finally, defendant complains of several alleged acts of prejudicial misconduct by the prosecution during the trial. The first pertains to the prosecution's reference in the closing argument to the fact that the question of the bank's existence at the time of the transaction remained unsettled. The evidence on this issue summarized in the preceding argument indicates that this was a fair comment on the matter.

■ Defendant also argues that his expert, Dr. Fort, was improperly cross-examined so as to emphasize the police reports, and similar documents, that in part were the basis of his opinion. The record indicates that on direct, Dr. Fort stated: "It is my custom to try to read and understand the points of view or perspectives of both sides in the adversary system, and *you furnished me with police reports from the City of Palo Alto,* and I think the City of Reno, a report from the Santa Clara District Attorney's Office investigating the charges against Mr. Mazoros.... I tried to find the sources of his anxiety, his depression, and to the limited extent possible the sources of his coronary artery disease." (Italics added.)

Thereafter, on cross-examination, the prosecution inquired as to the bases of defendant's anxiety that had been of "lesser severity prior to the last six years." Under the circumstances, it was logical for the People to pursue the reasons for defendant's increased anxiety the last six years. Dr. Fort was asked whether additional reports of criminal activity, in addition to those mentioned above and reviewed by him, were available, if these additional reports would play a role in his diagnosis of defendant's condition. Dr. Fort responded "I think it could be important, *particularly if such reports existed for a period of time prior to the three*

---

[9]The status of the bank either at the time of the June 1974 transaction or subsequently was never clarified.

*major factors that I have described to the Court that I think affected his responsibility and his thinking.* That is, if there were certain evidence of similar kinds of behavior . . . I think that would be particularly significant." (Italics added.) Thus, contrary to Dr. Fort's direct testimony, he had not been provided with all the relevant material for his considered medical opinion on defendant's condition.

The prosecution also asked if during Dr. Fort's examination, defendant had "gone into detail regarding criminal charges. . . . A. He went into some detail about the criminal charges, yes." Defendant also cites this question as additional misconduct. The prosecution is entitled to cross-examine the psychiatrist concerning any statements or declarations made to him by defendant that formed the foundation for his opinion as to defendant's medical condition (*People* v. *Whitmore*, 251 Cal.App.2d 359 [59 Cal.Rptr. 411]).

As to Dr. Shoor's testimony, discussed above, it was also proper for the prosecution to inquire as to the bases of his opinion, be it other police reports. Thus, there was no prejudicial misconduct by the prosecution in this line of questioning of Dr. Shoor.

■ Defendant also cites as misconduct the questions asked of Scoggin, William Fitler, Dr. Stephens and Robert Milner. The record indicates that these questions, set forth below,[10] pertained to defendant's physical appearance immediately before, during and after the Stockton court proceedings. Each of the witnesses had seen and observed defendant during the proceedings in Stockton.

Evidence Code section 780 provides, in pertinent part, that ". . . the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony. . . ." Here, the questions were proper as they went to impeach the credibility of defense testimony that defendant's physical and psychiatric condition had reached such a state of

---

[10]Dr. Stephens, when asked as to the "general condition" of defendant's health in 1967, replied that it was excellent except that defendant was overweight, but that after his first heart attack in 1971, defendant had been told not to travel or fly at high altitudes if there was any way around it.

Milner, a witness for defendant, indicated that prior to the Stockton trial, defendant looked depressed, walked with a shuffle, and needed help moving about from his son; afterwards, he appeared a little healthier and did not need assistance in walking.

Fitler's observations were similar to Milner's; Fitler was the People's witness.

deterioration that he was not responsible for his conduct in June 1974 and unable to stand trial a year later. We note that the record is devoid of any detailed discussion or examination on the nature, conduct or outcome of the Stockton proceedings.

Next, defendant claims that it was misconduct for the prosecution to question Scoggin about an alleged "affair" defendant had with a 23-year-old woman in Nevada during some of the negotiations when he was allegedly in such a condition of physical and psychiatric despair that his capacity was diminished. The record indicates that defense counsel objected on grounds of relevancy as only defendant's mental state was in issue. However, after the prosecution indicated that it went to defendant's physical condition and would be all tied in, further questioning was permitted. We think the question was proper for purposes of impeachment as defendant presented himself to Dr. Fort as a person who carried a portable oxygen tank, took nitroglycerin, numerous other drugs, fell asleep in a sitting position, had severe chest pains, and was unable to travel.

We conclude that none of the above mentioned questions constituted dishonest or bad faith attempts to persuade the court or jury by use of deception or reprehensible methods (*People* v. *Rhinehart*, 9 Cal.3d 139, 154 [107 Cal.Rptr. 34, 507 P.2d 642]). ▮ Bad faith must be shown to establish the existence of misconduct and is manifested when the prosecutor intentionally asks questions, the answers of which he knows to be inadmissible because they are prejudicial to the accused (*People* v. *Stokley*, 266 Cal.App.2d 930, 935 [72 Cal.Rptr. 513], cert. den., 395 U.S. 914 [23 L.Ed.2d 227, 89 S.Ct. 1761]).

▮ In any case, the burden is on defendant, who claims such misconduct to object and seek a curative admonition, unless: 1) the case is closely balanced and presents grave doubt as to the defendant's guilt and the misconduct contributed materially to the verdict, or 2) when the harm done by the misconduct could not have been obviated or cured by a retraction by counsel or admonition by the court (*People* v. *Beivelman*, 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913]; *People* v. *Meneley*, 29 Cal.App.3d 41, 59 [105 Cal.Rptr. 432]). Neither exception applies in the instant case. We also note that the record indicates that while defendant's counsel objected to each of the alleged acts of misconduct, no curative instructions or admonitions were requested. Accordingly, defendant cannot complain on this appeal (*People* v. *Meneley, supra,* p. 59).

The judgment is affirmed. The purported appeal from the sentence and verdict is dismissed.

Kane, J., and Rouse, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 16, 1978.