[Civ. No. 42519. First Dist., Div. Four. Sept. 28, 1978.]

TRANS WORLD AIRLINES, INC.,
Cross-complainant and Respondent, v.
ALITALIA-LINEE AEREE AIRLINES et al.,
Cross-defendants and Appellants.

## COUNSEL

Condon & Forsyth, Ronald E. Pace, Bronson, Bronson & McKinnon, Michael W. Field, Graham & James and Bonnie L. Stack for Cross-defendants and Appellants.

Derby, Cook, Quinby & Tweedt, Lloyd M. Tweedt and Dennis J. Kelly for Cross-complainant and Respondent.

## OPINION

**CHRISTIAN, J.**—Alitalia and Lufthansa appeal from a judgment awarding Trans World Airlines, Inc. indemnification against appellants for damages paid by TWA to a shipper whose goods were damaged while being shipped from Los Angeles to Pisa, Italy.

Gentry-Nevada, Inc., a Nevada corporation, is engaged in the manufacturing and racing of speedboats. On June 22, 1973, Fred Miller, chief mechanic of Gentry-Nevada, transported by truck to the freight office of TWA in Los Angeles, two specially built speedboat engines. The engines were new and were packed in new, solidly constructed, wooden crates. Each engine was worth approximately $14,000. Miller intended to install the matched pair of engines in Gentry-Nevada's 36-foot racer, *American Eagle,* which was located in Italy. Gentry-Nevada planned to enter the *American Eagle* in the World Cup Speedboat Championships to be held in Yugoslavia.

Miller told the TWA representative that he wanted the engines shipped to Frankfurt, Germany, aboard TWA, then shipped to Pisa, Italy, aboard another carrier, Seaboard, which Miller knew had a plane capable of taking the engines to Pisa. TWA accordingly issued an air waybill which showed routing to Frankfurt, Germany, aboard TWA and then aboard Seaboard to Pisa. Pursuant to its tariff and the terms of the air waybill, TWA retained the right to substitute carriers.

The engines were carried to Frankfurt by TWA. In Frankfurt, TWA transferred the engines not to Seaboard but to Alitalia. No damage to the cargo was noted on the transfer manifest issued by TWA at the time of transfer from TWA to Alitalia; the trial court found that ". . . Alitalia

and Lufthansa received said engines in apparent good order and condition as when shipped by Gentry-Nevada, Inc. in Los Angeles, California. Pursuant to a pooling agreement between Alitalia and Lufthansa, Alitalia transferred the cargo to Lufthansa and Lufthansa carried the two engines to Milan, Italy, on June 26, 1973.

When Miller arrived in Pisa, he found that the engines had not arrived there. Eventually learning that the engines were in Milan, Miller hired a truck and went to pick them up. When he opened the crates for customs, Miller discovered that one engine had been damaged. The crate had been punctured, apparently by a fork-lift truck. The damage report prepared by Alitalia stated that the damage to the engine was probably due to the crate's being dropped during transportation.

Appellants Alitalia and Lufthansa contend that the trial court erred when it failed to apply the indemnity provisions of the International Air Transport Association Interline Cargo Claims Agreement 1852. Specifically, appellants contend that the court should have apportioned the loss among the parties, pursuant to Part C(14)(b) of the Agreement. This agreement governs the investigation and disposition of air cargo claims among the participating air carriers. TWA, Alitalia and Lufthansa are all parties to the agreement. Part C(14)(b) provides, in relevant part, as follows: "(14) Where an action relating to a loss, for which one or more other interested carriers may be responsible, has been defended, the carrier defending the action shall have the benefit of the following rights of recourse: . . . (b) if the defense of the action has been unsuccessful, the amount of the judgment and the reasonable expenses and attorney's fees incurred in connection with the defense of the action shall be charged to each responsible carrier as agreed, or in connection with a concealed loss, in the ratio which the air transportation revenue received or receivable by it bears to the total air transportation revenue received or receivable by all responsible carriers."

In awarding full indemnity to TWA, the trial court apparently applied the federal common law rule that, where goods have passed through the hands of successive carriers in apparent good order, delivery at destination of damaged goods raises a presumption that the damage occurred while the goods were under the control of the last carrier. (See *Chicago & N. W. Ry.* v. *Whitnack Co.* (1922) 258 U.S. 369, 372 [66 L.Ed. 665, 667, 42 S.Ct. 328].) Appellants are correct in their contention that the present controversy is governed not by common law principles but by the IATA

Interline Cargo Claims Agreement 1852. The loss was a "concealed loss" as that term is defined in the IATA agreement: a "concealed loss" is "a loss which was not discovered until after delivery to the consignee or his representative [or to Customs authorities at destination]." The damage to the engines and crate was not discovered until after delivery to the consignee, Miller, at customs in Milan. Part C(14)(b) of the agreement provides that where an action relating to a loss for which one or more other "interested carriers" may be responsible has been unsuccessfully defended by a carrier, the amount of the judgment and the reasonable expenses and attorney's fees incurred in connection with the defense of an action involving a concealed loss shall be charged to each "responsible carrier" in the ratio which the air transportation revenue received or receivable by it bears to the total air transport revenue received or receivable by all responsible carriers.

Under the IATA agreement an "interested carrier" is defined as "a party hereto which issued an Air Waybill covering a shipment in respect of which a claim has arisen, or which participated or contracted to participate in the carriage of such shipment." Under that definition, respondent TWA and appellants Alitalia and Lufthansa are all "interested carriers." "Responsible Carrier" is defined as "an interested carrier which is wholly or partially responsible for having caused a loss." The trial court found that only appellants Alitalia and Lufthansa were responsible for having caused the loss.

■ That finding is supported by substantial evidence. The crates containing the engines were admittedly transferred to Alitalia and Lufthansa in Frankfurt for transport to Pisa. At the time of the transfer no exceptions (i.e., damage to the cargo) were noted on the transfer manifest. When Miller opened the crates in Milan he discovered that one engine was severely damaged and found a hole six inches by three inches in one side of the crate. This evidence supports the finding that the damage occurred while the crate was in the custody of Alitalia and Lufthansa.

Since only Alitalia and Lufthansa were "responsible carriers" within the meaning of the IATA agreement, TWA was entitled, under Part C(14)(b), to recover from each the amount of the judgment and the reasonable expenses and attorney's fees incurred in connection with the defense of the action, "in the ratio which the air transportation revenue received or receivable by [each responsible carrier] bears to the total air transporta-

tion revenue received or receivable by all responsible carriers." Alitalia and Lufthansa stipulated at trial that the trial court need not make any determination as to the ratio of Alitalia's and Lufthansa's liability. We conclude, therefore, that although federal common law was inapplicable, the result reached by the court was correct and complete.

■ Lufthansa contends that it was error for the court to receive in evidence the transfer manifest for the engine shipment showing transfer of the goods in apparent good order and condition by TWA. On the bottom right side of the document is typed, "Alitalia," and above that is the stamp, "F.A.G." Appellant Lufthansa contends that the transfer manifest was improperly admitted under the business records exception to the hearsay rule. (See Evid. Code, § 1271.) It contends that an insufficient foundation for the admissibility of the document was laid because the custodian of the document did not testify. Evidence Code section 1271 provides:

"Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if:

"(a) The writing was made in the regular course of a business;

"(b) The writing was made at or near the time of the act, condition, or event;

"(c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and

"(d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

Carl Hilts, head of cargo claims for TWA, testified that he was the present custodian of the transfer manifest and that he personally retrieved the document from the normal custodian of the records in Kansas City. Hilts testified that the document was a business record of the transfer of the shipment at Frankfurt airport on June 24, 1973, from TWA to Alitalia and that the document was maintained in the normal course of TWA's business. The document is also apparently required by IATA procedures. Hilts stated that "according to IATA procedures, a revenue accounting department may maintain the original or first copy of the document." Hilts testified that the document showed that the transfer was

of the shipment under a specified air waybill of two pieces weighing 2,215 pounds to be transported to Pisa. Alitalia had admitted receiving the cargo in Frankfurt, and in a response to a pretrial request for admissions, admitted that the transfer manifest "is identical to a similar document in the possession of Alitalia." The record reveals that Hilts was a proper "custodian or other qualified witness" to testify to the transfer manifest's identity and mode of preparation as a business record. In determining whether a document meets the requirements of a business record, the trial judge is vested with broad discretion. (See *People* v. *Dorsey* (1974) 43 Cal.App.3d 953, 961 [118 Cal.Rptr. 362]; *Exclusive Florists, Inc.* v. *Kahn* (1971) 17 Cal.App.3d 711, 716 [95 Cal.Rptr. 325].) It was not an abuse of discretion to admit the transfer manifest.

Lufthansa contends that the trial court should not have admitted the testimony of Hilts, and that of Gunter Mosler, who was TWA's manager of cargo sales and services for Germany and Austria, that F.A.G. was the cargo handling agent for Alitalia at Frankfurt airport. As previously noted, the stamp of F.A.G. appeared above the name, "Alitalia," on the transfer manifest. Hilts testified that F.A.G. was "presumably an agent of Alitalia." He stated that his assumption was based upon the fact that the F.A.G. stamp appeared above Alitalia on the transfer manifest, and upon his experience in the airline industry, that there are several cargo handling agents similar to F.A.G. that act for airlines at airports throughout the world. However, Hilts testified that he did not have personal knowledge as to whether F.A.G. had a contract with Alitalia, but that he was familiar with the stamp of the F.A.G. cargo handling agent, as he had seen that particular stamp several times. The deposition on written interrogatories of Gunter Mosler, which was read into the record, contained similar evidence.

Lufthansa's contention is that the testimony of Hilts and Mosler indicating that F.A.G. was the cargo handling agent of Alitalia at Frankfurt, Germany, should have been excluded because it was not based upon personal knowledge. (See Evid. Code, § 702.) Hilts admitted that he had no personal knowledge of any agreement between F.A.G. and Alitalia. But he testified to the fact that the F.A.G. stamp appeared above Alitalia's name on the transfer manifest, that he was familiar with the F.A.G. stamp, and that various airlines used cargo handling agents similar to F.A.G. at many airports. This testimony was based upon personal knowledge and was admissible. Mosler's testimony that F.A.G. was the cargo handling agent of Alitalia in Frankfurt appears to be based

upon personal knowledge. Mosler personally supervised TWA's cargo business in Germany in June of 1973. He stated that he had "personal knowledge" of TWA's procedure for documenting the transfer of a shipment at Frankfurt from TWA to another carrier such as Alitalia. The record supports the trial court's determination that Mosler was testifying to matters within his own knowledge acquired in the discharge of his duties.

■ Lufthansa contends that TWA is not entitled to receive from Lufthansa and Alitalia any portion of TWA's fees and costs because TWA failed to perform adequately its duty under the IATA agreement to defend the action. But the record reveals that, as required by the IATA claims agreement, TWA notified both appellants of Gentry-Nevada's action and requested their advice and cooperation in the defense of the action. Part C, paragraphs (17) and (18), of the IATA agreement provide that:

"(17) Every party hereto shall, upon the written request of a carrier handling a claim or defending an action in accordance with these procedures, furnish all information and data in its possession relating to such claim or action, and shall render all reasonable assistance requested in connection with the settlement of such claim or action or the defense of such action.

"(18) If a carrier fails to answer a request of another carrier made in accordance with these procedures within a reasonable time, such failure shall be deemed to be an acquiescence in whatever decision arising out of the subject matter of such request the requesting carrier may make."

There is no evidence that either Alitalia or Lufthansa ever responded to TWA's request. Lufthansa's contention is thus without merit.

The judgment is affirmed.

Caldecott, P. J., and Rattigan, J., concurred.