Filed 2/2/23  Conservatorship of S.A. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person of S.A. | |
| CONTRA COSTA COUNTY PUBLIC GUARDIAN, <br><br>     Petitioner and Respondent, <br><br> v. <br><br> S.A., <br><br>     Objector and Appellant. | A164805 <br><br> (Contra Costa County Super. Ct. No. P21-01236) |

S.A. appeals from an order of conservatorship under the Lanterman-Petris-Short Act.  She contends the trial court erred in admitting psychiatric records under the business records exception to the hearsay rule that contained inadmissible multiple hearsay, opinions and conclusions.  We affirm.

## BACKGROUND

### I.

### *The Petition*

On August 26, 2021, the Contra Costa public guardian (public guardian) filed a petition for appointment of temporary conservator and

1

conservator of the person of S.A. (Welf. & Inst. Code, §§ 5350, 5352, 5352.1.) The petition alleged that S.A. was gravely disabled as a result of a mental disorder and unwilling to accept, or incapable of accepting, treatment voluntarily. A supporting declaration from a psychiatrist at John Muir Behavioral Health Center (John Muir) attested to S.A.'s grave disability and need for a conservatorship, with explanatory details set forth in the declaration of a treating therapist. An order appointing temporary conservator was filed the same day.

S.A. had been admitted to John Muir on August 5, 2021, and was discharged on September 14, 2021. She subsequently entered a different psychiatric facility, Canyon Manor, where she remained at the time of trial.

With S.A.'s concurrence, several hearing dates were continued until, at a hearing on January 11, 2022, S.A. objected to the petition and requested a "time not waived" court trial. Trial was set for January 25, then continued several more times until March 1.

## II.

### *The Trial*

The sole witness at trial was clinical psychologist Dr. Jennifer Weinstein, who testified for the public guardian as an expert in psychology and grave disability. Weinstein interviewed S.A. at Canyon Manor on February 22, 2022, for about 40 minutes, which she testified was an adequate period of time to evaluate S.A. for grave disability. Weinstein also spoke with S.A.'s conservator, social worker and father, and reviewed records from John Muir and Canyon Manor. She testified that the medical records are the kind of records commonly relied upon in her field. Based on the interviews and her review of the medical records, Weinstein concluded that S.A. was gravely disabled.

Weinstein diagnosed S.A. with schizophrenia. This diagnosis requires the presence for more than a month of two or more symptoms, one of which must be disorganized speech, delusions or hallucinations ("positive symptoms") and the other of which may be a "negative symptom" such as lack of motivation, isolating oneself or difficulty with activities of daily living. The symptoms interfere with judgment, insight, cognition, and ability to plan and follow through on a plan, take care of needs like hygiene and shelter, and interact socially with appropriateness. Weinstein testified that schizophrenia is a chronic disorder but there may be times when symptoms are more severe and times when they are "more managed." S.A. was taking Clozaril, an antipsychotic medication that requires a blood test every two weeks to monitor for a rare blood disease. Weinstein testified that medication can help reduce symptoms, case management can help maintain self-care and use of medication, and living in a structured placement can be a treatment for a patient who needs daily intervention assistance.

## A. S.A.'s Interview

Weinstein testified that S.A. was oriented to who and where she was during the interview on February 22. S.A. told Weinstein that prior to her placement she had tried to exit a vehicle "while being driven or about to be driven" by her case manager, and said that she would have been harmed if she had not tried to exit the vehicle. S.A. made comments that Weinstein deemed delusional, including that "in 2017 someone on drugs got into her body and made her overdose on DMT, which is a type of drug" and " '[t]hey got into my body and lifted up out of my body.' "

Weinstein testified that S.A. had "some insight" into having a mental health condition: S.A. said she had previously been diagnosed with "dissociative identity disorder amnesia and bipolar disorder" and "agree[d]

3

with those diagnoses, but [was] also diagnosed with schizoaffective disorder and [did] not agree with that diagnosis." Weinstein explained that "insight" in this context means the patient's understanding of her own psychiatric condition and needs for psychiatric care, which is often correlated with an ability to willingly engage in needed treatment.

S.A. told Weinstein that her history of symptoms included auditory hallucinations, depression, anxiety and trouble focusing. She said she had previously taken the medication Invega Sustenna at a local clinic, and had been taking Clozaril for five months. She told Weinstein that if the conservatorship ended, she planned to live with her fiancé. She declined to give a name or number for the fiancé, saying she had had people stalk her, she did not feel comfortable sharing and she did not think he would want her to share his private information. S.A. told Weinstein that people had followed her to her fiancé's house and said they would "light a bomb . . . [¶] [o]n fire" if she went to his house. Weinstein testified that paranoid delusions—concerns "that others are out to harm oneself" and "collaborating against oneself"—are a symptom of schizophrenia.

## B. Records-Based Testimony

Weinstein was asked about a number of entries in S.A.'s medical records from John Muir (exhibit 2) and Canyon Manor (exhibit 3), which were admitted over S.A.'s objections, with redactions, as business records under Evidence Code section 1271.[1]

---

[1] Further statutory references will be to the Evidence Code unless otherwise specified.

Counsel for the public guardian offered the records into evidence under section 1271, stating that they were accompanied by declarations complying with section 1561. S.A.'s attorney objected that several entries within the

4

Weinstein testified that an entry in exhibit 2 stating that "patient upon arriving to the unit continued to be very psychotic and disorganized," and describing S.A. as "labile, agitated, aggressive towards staff and requiring physical restraint," showed the psychiatric symptoms S.A. was suffering from when she transitioned from the community to the psychiatric facility. A description of S.A. as "appearing internally preoccupied, uncooperative and disorganized," which are symptoms that "can significantly interfere with functionality" when unmanaged, supported the diagnosis of schizophrenia.

Asked about the notation "active AH" in an August 9, 2021 entry, Weinstein testified that "AH" stands for auditory hallucinations. She testified that the entry, which read, " 'active AH, believes she's possessed by Satan,' " was evidence of a symptom of schizophrenia that she relied upon in forming her diagnosis, and that auditory hallucinations and "delusional belief of possession" can interfere with thinking, judgment and decision-making.

Weinstein testified that a note stating, " [r]eports being possessed by multiple persons'" was similar to a statement S.A. made during the February 2022 interview and revealed a delusion, which is a symptom of schizophrenia. Another note stated " 'DZ Zyprexa due to,' quote, 'it has a chemical in it that's not good. I want to be back on the Seroquel.' " Weinstein testified that this entry "reveal[ed] that [S.A.'s] mental state or diagnosis or delusion in this case interfered with her ability to accept treatment."

---

exhibits were inadmissible on hearsay or foundation grounds and asked the court to receive the exhibits subject to examination of the witness and objection to specific portions. The court received the exhibits subject to further redactions, and subsequently heard argument and ruled upon objections to specific portions.

An entry from August 24 stated that S.A. was "still hearing the voice of Isaiah, her guardian angel" and felt comforted by this; an entry from August 26 said S.A. denied hearing Isaiah's voice that day but still felt "in contact with him." Weinstein testified that these records "reveal the patient's belief that would be labeled a delusion about a contact with somebody who is otherwise known to others as a fantasy," which is a symptom of schizophrenia.

An October 14, 2021 entry in exhibit 3, the Canyon Manor records, related that when asked about demons, S.A. said a peer "was possessed by the demon, and the demon transferred from the peer to her, and she felt it. She indicates that she prayed to St. Michael, and that it went away. And that St. Michael and her father are close, but she did not wish to discuss that." Weinstein testified this was evidence of a paranoid delusional belief at a different period of time, further supporting the schizophrenia diagnosis.

Weinstein saw further evidence of paranoid delusions in a November 11, 2021 entry relating S.A.'s report that she "has anxiety when seeing people eating. She gets nauseated and cannot eat in public and then indicates demons gave her gluttony in the form of an eating disorder. [¶] And once she ate in a restaurant, and the waiter gave her quote, blood, guts, fingernails and eyeballs, end quote, instead of food." Weinstein testified that these delusions "interfered with [S.A.'s] proper nourishment or ability to nourish herself."

A note from November 24, 2021, said S.A. planned to move to her fiancé's cousin's house but could not talk about her fiancé and said he was famous. Weinstein testified that this note affected her opinion about S.A.'s mental health condition in that the plan appeared to "potentially lack grounding in reality." Weinstein testified that a belief about having a fiancé

"could be a delusion" and a belief that the fiancé is famous was "possibly or likely a grandiose delusion," which is a belief that "oneself or others connected to oneself are of a super extraordinary nature or have powers or are somehow extraordinary."

A further entry related that S.A. " 'indicates that the demons are less bothersome because she's not at home, and then pauses and says she doesn't believe in demons anymore,' that it was, quote 'set up by human people,' end quote. And then: 'She suspects people from high school who don't like that she's marrying a famous person harass her.' " Weinstein testified that this entry revealed paranoid delusions, confusion about whether the delusions exist and "paranoia about being harassed or set up by others."

A December 2021 note that reported S.A. saying she "doesn't have distorted thoughts anymore and denies demons currently," showed that S.A.'s "delusion beliefs" had changed; the same entry related that S.A. planned to discharge to her fiancé's house, which indicated that a "possibly or likely a delusion" continued despite the change regarding the delusion about the demon.

A note dated January 17, 2022, indicated that S.A. had started attending "higher functioning groups," her participation was "limited" and she still did not understand why she was at Canyon Manor and wanted to be released from conservatorship. Weinstein testified that this note revealed that "while there has been some improvement in symptom reduction, her ability to grasp the reason behind her admission and her ability to meaningfully engage[] in the treatment is limited." It also showed a "fixation" or "focus" on being released, which Weinstein had also observed in S.A.

7

In Weinstein's opinion, S.A. had "some insight" into the fact that she had a mental health "difficulty or diagnosis," but it was "limited by her symptoms . . . and her diagnosis," leaving her unable to understand the nature of her psychiatric condition and her need for the psychiatric care she was receiving. Asked if she believed S.A. would continue to take her medication if she was released from conservatorship, Weinstein said S.A. had not spoken of planning to stop taking her medication but opined that S.A. would not have enough assistance or structure in the community to support continuing her current medication regimen, with its required blood draw. Although S.A.'s symptoms had lessened since her admission to John Muir, Weinstein testified that symptoms "[m]ost often" return and become more severe when medication is stopped.

Asked how S.A.'s mental disorder affected her ability to provide for her basic needs, Weinstein stated that S.A.'s symptoms—including paranoid and grandiose delusional thinking and auditory hallucinations—interfered with her ability to differentiate reality from fantasy, make decisions, take care of herself on a day-to-day basis, and use judgment. In Weinstein's opinion, S.A. was not at that time able to "rationally advocate for herself in order to obtain shelter."

C.    **Cross examination**

Weinstein testified on cross examination that during her interview S.A. said she was not currently experiencing symptoms of mental illness but a year and a half ago had heard voices for a week. S.A. said she had received an injection of Invega Sustenna at a clinic in September 2021 and had been receiving these shots on a monthly basis; she did not feel safe in the car with the case manager who was driving her to get the injections; and this case manager was the driver in the incident that occurred prior to her

8

hospitalization.  She told Weinstein that she had previously taken a different medication called Latuda, which Weinstein testified was a mental health medication.  S.A. told Weinstein that she received $990 per month in Social Security disability payments and, if released from conservatorship, she would have her disability income changed to direct deposit and Uber to the grocery store or use a delivery service to obtain food.  She also suggested an alternative post-discharge plan of working with the social worker at Canyon Manor to arrange for transfer to an "equal level" placement called Villa Fairmont.  She told Weinstein she had been assaulted by a resident at Canyon Manor.

### D.    Conclusion of the Trial

After the public guardian rested its case in chief and S.A. rested without presenting evidence, the court overruled S.A.'s general hearsay objection to exhibit 2, explaining that it had reviewed the document and found it trustworthy pursuant to *Conservatorship of S.A.* (2018) 25 Cal.App.5th 438 (*S.A.*).  The court recognized there could still be objections to specific entries and asked S.A.'s counsel to identify the portions he objected to.  In addition to entries that appeared to be summaries or restatements of entries by other staff, counsel objected to entries "indicating a clinical judgment"—specifically, "poor insight," "psychotic" and "processing or fully comprehending information."  The court overruled these objections.

Regarding exhibit 3, S.A. objected to information that did not clearly come from within the facility or from S.A. herself, as well as "recommendations, opinions, goals of the facility."  Counsel then stated objections to specific entries in exhibit 3.  After hearing argument, the court overruled many of the objections and sustained others, resulting in further redactions.

9

Following arguments on the merits, the court found S.A. was gravely disabled and was to "remain at the MHRC [Mental Health Rehabilitation Center] level." The court found clear and convincing evidence to support imposition of three of the four disabilities the public guardian requested: S.A. was not permitted to have a driver's license, to possess a firearm or other deadly weapon, or to enter into legal contracts. The court did not find clear and convincing evidence to support removing S.A.'s power to refuse or consent to treatment.

## DISCUSSION

Where specified conditions are met, the business records exception to the hearsay rule allows admission of a writing "made as a record of an act, condition, or event" "in the regular course of a business" to prove the act, condition or event. (§ 1271.) S.A. acknowledges that medical records may be admissible under the business records exception "to prove the acts, conditions, and events recorded therein." (*S.A., supra,* 25 Cal.App.5th at p. 447; § 1271.) She argues, however, that much of the contents of the records here was not admissible because it did not satisfy requirements of the exception, including personal knowledge of the person who created the record, contemporaneous recording and demonstration of applicable exceptions for hearsay within the records. Her claims fall into two main (and sometimes overlapping) categories: Objections to admission of multiple levels of hearsay and objections to records relating opinions and conclusions rather than observations of acts, conditions or events.

### I.

### *Governing Principles*

"The business records exception requires a foundational showing that (1) the writing was made in the regular course of business; (2) at or near the

10

time of the act, condition, or event; (3) the custodian or other qualified witness testifies to its identity and mode of preparation; and (4) the sources of information and mode and method and time of preparation indicate trustworthiness." (*S.A., supra,* 25 Cal.App.5th at p. 447; § 1271.) "These requirements may be satisfied by affidavit." (*S.A.,* at p. 447; § 1561.)[2] "The trial court has wide discretion to determine whether there is a sufficient foundation to qualify evidence as a business record; we will overturn its decision to admit such records only upon a clear showing of abuse." (*S.A.,* at p. 447.)

"The key to establishing the admissibility of a document made in the regular course of business is proof that the person who wrote the information or provided it had knowledge of the facts from personal observation." (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 322.) "Only that portion of the record is admissible which states facts which would be admissible had the person who made the record been called as a witness and had been examined in court; that is, only that portion of the record, made by one who could qualify as a perceptive witness to the matter recorded, is admissible." (*People v. Salcido* (1966) 246 Cal.App.2d 450, 462.) Where a record contains statements of others, those statements cannot be admitted for their truth

---

[2] Section 1561 requires that records be accompanied by "the affidavit of the custodian of records or other qualified witness" and specifies the matters that must be addressed. Most relevant here is that "[t]he records were prepared by the personnel of the business in the ordinary course of business at or near the time of the act, condition, or event." (§ 1561, subd. (a)(3).)

S.A. does not raise any issues on appeal pertaining to the affidavits accompanying the records; her claims focus on the content of particular entries within the records.

unless there is an applicable hearsay exception for each level of hearsay. (*People v. Sanchez* (2016) 63 Cal.4th 665, 674-675.)

Psychiatric records have been distinguished from what S.A. calls "purely medical" records in that psychiatric records "tend to be opinions, rather than the record 'of an act, condition or event' which is admissible under Evidence Code section 1271" and a "psychiatric diagnosis is often merely the reasoning or thought process of the psychiatrist rendering the opinion, and as such cannot be deemed to be the record 'of an act, condition or event.'" (*People v. Young* (1987) 189 Cal.App.3d 891, 912; *People v. Reyes* (1974) 12 Cal.3d 486, 503.) *Reyes* commented on the distinction between such a psychiatric diagnosis and one based on straightforward observation: "'"It is true that some diagnoses are a statement of a fact or condition, for example, a diagnosis that a man has suffered a compound fracture of the femur is a record of what the person making the diagnosis has seen[,] but this is not true where the diagnosis is but the reasoning of the person making it arrived at from the consideration of many different factors."'" (*Ibid.*)

The trial court in the present case took particular guidance from *S.A.,* which held that a conservatee's medical records, redacted for "conclusions, opinions, and remote or immaterial matters" she identified, were admissible under the business records exception. (*S.A., supra,* 25 Cal.App.5th at pp. 442, 447.) Rejecting the conservatee's arguments that the medical records were inadmissible hearsay and an expert witness improperly testified to case-specific facts in the records that were not otherwise proven, *S.A.* explained: "S.A. argues that not every entry expressly states that the person who recorded it was the direct observer. She points, for example, to an entry that begins 'Per staff . . . ' and questions whether the writer witnessed the events. But the trial court considered these arguments, reviewed the records,

12

and found the [facility] records were 'clearly the reports of persons and staff, licensed psychiatric technicians, . . . who are reporting [S.A.'s] observed conduct' and the board and care facility records were 'obviously the observations . . . of the people in the psychiatric program.'" (*S.A.,* at p. 448.)

With respect to expert testimony based upon medical records, "[a]n expert witness may rely on hearsay in forming an opinion, and may tell the jury 'in general terms' that she did so, but may not 'relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception.' " (*S.A., supra,* 25 Cal.App.5th at p. 448, quoting *People v. Sanchez, supra,* 63 Cal.4th at pp. 685-686.) *Sanchez* applies to conservatorship proceedings. (*S.A.,* at p. 448; *Conservatorship of K.W.* (2017) 13 Cal.App.5th 1274, 1284.)

## II.

### *Analysis*

#### A. S.A. Has Not Demonstrated an Abuse of Discretion Regarding Multiple Hearsay.

S.A. argues that exhibits 2 and 3 contained multiple hearsay that the trial court erroneously admitted without requiring the public guardian to establish a hearsay exception for each level.

S.A. describes exhibit 2 as a five-page summary drafted by Ameek S. Mundi, DO, that provides an overview of S.A. for each day she was detained at the facility but does not state that the information was known to Dr. Mundi personally or identify the source of the information, so that "[e]very entry contains an unknown level of hearsay." She contends the trial court erred in treating statements from one staff member to another as reliable, citing two pages of the reporter's transcript that reflect questions based on particular entries in exhibit 2. As to exhibit 3, S.A. points to a number of

13

specific entries: She argues it is unclear whether statements attributed to her were made directly to the social worker who wrote an assessment appearing at page 8; some of the weekly progress reports at pages 52-57 include a section that summarizes information received from other employees; an intake report at pages 58-59 refers to log notes from John Muir containing statements by S.A.'s family and outpatient social worker as well as psychiatric and social history; and it is "unclear" whether information stated in "comment boxes" in weekly progress reports at pages 70, 74 and 75 was known personally to the comment writer.

S.A.'s arguments fail for several reasons. First, for many of the entries she challenges, S.A. provides citations only to exhibits 2 or 3, neither of which was included in the record on appeal. Consequently, our review is limited to what we can glean from discussion of the exhibits at the hearing. The discussion reflected in the reporter's transcript is often insufficient to permit consideration of a given entry in context without reference to the document itself. It is S.A.'s burden to provide an adequate record to assess error, and failure to do so requires that the issue be resolved against her. (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502.) S.A. thus has not satisfied her burden of affirmatively demonstrating error (*ibid.*) with respect to many of the entries she challenges.

Second, some of S.A.'s challenges are to entries that the reporter's transcript indicates may in fact have been redacted. For example, with reference to pages 56, 57 and 58 of exhibit 3, the trial court agreed that an "intake report" relating statements from "the case manager" appeared to come from an external source—i.e., did not relate observations from staff at Canyon Manor. Counsel for the public guardian agreed that a portion of another note on page 58, also reflecting information obtained from another

14

facility at intake, should be redacted, and the court stated it would not look at this information. The court held that a passage on page 58 that was ambiguous as to whether the information came directly from S.A. would be redacted, as would a report of prior diagnoses that did not clearly come from S.A. and another passage on page 59 that S.A.'s attorney viewed as speculative and counsel for the public guardian did not object to redacting.

Third, from our review of the reporter's transcript, we see no basis for finding the trial court abused its discretion in admitting the entries it found to come within the scope of the business records exception.

The foundation of S.A.'s claim is that many of the entries in the records do not expressly state that the matter related was personally observed by the individual who wrote the entry. S.A. argues that the trial court could not know a source was trustworthy (§ 1271, subd. (d)) without knowing who the source was, could not know whether multiple layers of hearsay were relayed without knowing where the source obtained the information, and could not determine whether an entry was made close in time to the incident (§ 1271, subd. (b)) without knowing when the incident was witnessed.

We are aware of no requirement that each entry in medical records such as these specify its author or expressly state that the author observed the recorded incident, and the decision in *S.A., supra,* 25 Cal.App.5th 438, is to the contrary. *S.A.* rejected the argument that entries lacking an express statement of personal observation were inadmissible because the trial court, which had considered the conservatee's arguments and reviewed the records, concluded the entries were " 'clearly the reports of persons and staff, licensed psychiatric technicians, . . . who are reporting [the conservatee's] observed conduct' " and " 'obviously the observations . . . of the people in the psychiatric program.' " (*Id.* at p. 448.) The same conclusion is implicit here in the trial

15

court's finding that the entries were from a trustworthy source within the facility. (See also *People v. Orey* (2021) 63 Cal.App.5th 529, 551-552 [trustworthiness, in context of public employee record exception (§ 1280) "may be established by showing that a written report is based on the observations of a public employee who has a duty to observe the events and to report and record them accurately"].)[3] To the extent the entries in exhibits 2 and 3 related S.A.'s conduct and statements—as opposed to diagnoses and evaluations of her condition, as will be discussed—they were records written by staff whose job it was to record observations relevant to S.A.'s treatment in the regular course of their employment at the facility.

We are also unaware of any requirement that individual entries specify they were made at or near the time of the observation recorded. Part of the required foundation for admission under section 1271 is an affidavit from the custodian of records attesting that "[t]he records were prepared by the personnel of the business in the ordinary course of business at or near the time of the act, condition, or event." (§ 1561, subd. (a)(3).) S.A. does not claim the custodian's declaration in this case lacked this attestation and, having failed to include the records or accompanying declarations in the appellate record, has not demonstrated any such error.[4]

---

[3] Both the business records exception and the public employee records exception require that "[t]he sources of information and method and time of preparation were such as to indicate its trustworthiness." (§§ 1271, subd. (d), 1280, subd. (c).)

[4] S.A. notes that the custodians' declarations do not assert the entries were written by the person who witnessed the event described or that only events witnessed by staff were documented. She cites only to exhibits 2 and 3 and, as we have said, she did not make the exhibits part of the record on appeal.

16

The trial court properly relied upon *S.A.* to rule that entries describing observations of "trustworthy source[s]" "within the facility" were admissible under section 1271. This included entries relating statements made by S.A., which were admissible as party admissions. (§ 1220.)[5] As noted above, the trial court redacted entries relating information that appeared to come from sources outside the facility or did not clearly appear to have come from S.A.'s own statements.

For instance, as indicated above, S.A. cites two pages of the reporter's transcript in connection with her assertion that the trial court erroneously admitted statements from one staff member to another. At the first of these pages, the trial court overruled S.A.'s objection to a question asking Weinstein about an August 9 note referring to "active AH," which Weinstein testified stands for auditory hallucinations. S.A. argued at trial that the reference was inadmissible without a showing of how the author of the note learned the information and concluded there was a hallucination, and she now contends the trial court erred in accepting the public guardian's position that the business records exception does not require that a record list " 'who heard what when.' " As S.A.'s counsel acknowledged at trial, the note continued, "believes she's possessed by Satan," thus implicitly explaining that S.A. voiced the delusional belief. In overruling the objection, the trial court stated that "[g]iven the context of the notes," the second statement provided a trustworthy basis for the first and "the entries as a whole appear to be from within the facility and from a trustworthy source."

---

[5] S.A. recognizes that such statements are admissible if reported by the individual who directly heard her make them; her objection to these entries is that they do not affirmatively demonstrate she made the statements to the author of the entry.

At the second page S.A. cites, the trial court overruled her objection to a question about an August 10 entry that stated, "Reports being possessed by multiple persons." S.A. objected that there was a "long sequence of entries on different dates," which counsel viewed as possibly including multiple layers of hearsay because it appeared the author was summarizing others' reports rather than contemporaneously recording an incident. The public guardian pointed to the declaration of the custodian of records stating these were records of acts, conditions or events "as regularly taken and recorded in the course of this business," and the court overruled the objection.

The reporter's transcript reflects that the trial court carefully considered each entry to which S.A. objected: The court heard, considered and ruled on S.A.'s objections to Weinstein's testimony based on the medical records as they arose during the course of that testimony, then later heard, considered and ruled on additional objections to the documents themselves.[6] We find no abuse of discretion in its determination that entries in S.A.'s medical records, by staff whose job it was to record their observations of S.A.'s conduct, were trustworthy and made in the regular course of the facility's business. (*S.A., supra,* 25 Cal.App.5th at p. 448.)

---

[6] As one example of the court's attention to hearsay issues, during its discussion of the records with counsel, after agreeing that an entry in exhibit 3 should be redacted because the information appeared to come from an "external source," the court interjected that an entry in exhibit 2 had the "same report of the exiting vehicle" that "seem[ed] to come from an external source" and commented, "the end result is that I have that information in this case from [S.A.], but I want to respect the Hearsay Rule for its purposes."

18

## B. The Trial Court Did Not Abuse Its Discretion in Admitting Records Reflecting S.A.'s Observed Conduct.

S.A. contends the trial court erroneously admitted entries that related inadmissible opinions and conclusions rather than the acts, conditions or events permitted under section 1271. Specifically, she points to entries in exhibit 2 stating she was " 'unable to engage in an interview,' " " 'very psychotic,' " " 'disorganized,' " " 'labile,' " " 'aggressive towards staff,' " " 'responding to internal stimuli,' " " 'internally preoccupied,' " had " 'poor insight,' " had " 'paranoid delusions,' " had " 'auditory hallucinations and delusional thinking,' " was " 'showing improvement,' " was " 'anxious but otherwise doing ok,' " and was " 'not agitated, aggressive, or threatening.' " In S.A.'s view, while an entry stating that she was seen talking to someone when she was alone in the room, or quoting something she said, would be an admissible observation, the above remarks are inadmissible opinions and conclusions "filtered through the mental process of the writer." Similarly, regarding exhibit 3, S.A. references a social worker's report at page 8 that "intertwines statements made by [S.A.] with opinions and conclusions"; weekly progress reports at pages 52-57 that include sections describing the doctor's impressions of S.A. that day ("MSE"), relating "items the doctor considers important" ("IMP") and providing instructions to staff for the coming week ("Plan"); and a report at page 66 that contains the social worker's conclusion regarding S.A.'s "threat risk" as well as descriptions of the social worker's observations.

Again, to the extent S.A.'s challenges to the trial court's rulings depend on citation to pages in exhibits 2 or 3, her failure to include the exhibits in the appellate record compels us to find she has not affirmatively demonstrated error. For instance, we have no means of evaluating S.A.'s

19

assertion that the social worker's report at page 8 of exhibit 3 "intertwines statements made by [S.A.] with opinions and conclusions." S.A. does not point to any discussion of this entry on the record that might illuminate its details, and our review of the reporter's transcript discovered references to page 8 only in connection with objections to information derived from sources outside the facility.

Additionally, as with the multiple hearsay objections discussed above, some of the entries S.A.'s appellate briefs challenge as opinions and conclusions appear to have been redacted by trial court. For example, the entry at page 66 of exhibit 3 to which S.A. objected at trial was redacted[7] and the court sustained S.A.'s objection to the "plan" portion of the entries.

As for S.A.'s general contention that the trial court erroneously admitted entries relating opinions and conclusions, we disagree. While courts have observed that a psychiatric diagnosis "tend[s] to be [an] opinion[]" based on "the reasoning or thought process of the psychiatrist rendering" it (*People v. Young, supra,* 189 Cal.App.3d at p. 912; *People v. Reyes, supra,* 12 Cal.3d at p. 503), an observable psychiatric *symptom* is an "act, condition or event" within the meaning of section 1271. S.A. views descriptions in the records such as "psychotic," "aggressive," "responding to internal stimuli," "delusional" and having "poor insight" as conclusions and opinions because they do not relate what the observer saw in literal terms: As earlier noted, in

_____

[7] S.A. does not explain in her opening brief what she means by the social worker's "conclusion" regarding her "threat risk"; her reply brief refers to page 66 as containing a " 'client unsafe behavior assessment' " that is then referred to as a "risk assessment." At trial, referring to page 66 of exhibit 3, S.A.'s attorney objected to an entry describing S.A. "fidgeting, saying that she wants to go into a facility where she could smoke" and stating, " 'This may be a reason for her to attempt AWOL.' "

S.A.'s view, to be admissible, an entry would have to state that she was seen talking to someone when she was alone in a room rather than that she was hallucinating or delusional, or quote something S.A. said without characterizing it as a threat or a delusion.

The trial court viewed the challenged entries as "observations of staff who are not lay people" but rather "trained professionals of varying degrees." In the context of medical records from a psychiatric facility, the court saw terms such as "psychotic" or "lack of insight" as "boiling down a series of behaviors into one description . . . without being a diagnosis." We agree. In this context, entries stating S.A. appeared "aggressive," "delusional," and "psychotic" described S.A.'s conduct and condition; they were more like "terms of art," as the public guardian characterized them, than reasoned diagnoses based on consideration of multiple factors.

S.A.'s analogy to *Palmer v. Hoffman* (1943) 318 U.S. 109 (*Palmer*) is unpersuasive. *Palmer* held that a railroad employee's accident report, although made in the regular course of business, was not a routine record of the business's day-to-day operations within the meaning of a business records exception. The Court explained that the purpose of the exception was to lessen the time and expense required to use in litigation records that were "considered reliable and trustworthy for major decisions in the industrial and business world." (*Id.* at p. 112.) As the Court observed in a subsequent case, the accident report "did not qualify as a business record because, although kept in the regular course of the railroad's operations, it was 'calculated for use essentially in the court, not in the business.'" (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 321, quoting *Palmer,* at p. 114.)

S.A. contends the log notes in exhibits 2 and 3 are "more like accident reports discussed in *Palmer* than systematic and routine entries" in that each

21

entry "is the product of a writer making a judgment that a particular incident or issue is significant, and is filtered through that judgment," and the "filter may include more than one person's perception." To the contrary, *Palmer* supports the admissibility of the records at issue here. S.A.'s medical records are trustworthy precisely because they document the observations of staff whose job was to record such observations, which were relied upon in the course of the facility's day-to-day business of assessing and treating psychiatric patients.

As we have said, the trial court "has broad discretion in admitting business records under Evidence Code section 1271" (*People v. Dorsey* (1974) 43 Cal.App.3d 953, 961), and "it has been held that the foundation requirements may be inferred from the circumstances." (*Ibid.*) The trial court here distinguished between a diagnosis, which all recognized would not be admissible as a business record, and observations made by facility staff whose job was to keep records of S.A.'s behavior and condition for use in her assessment and treatment. We find no abuse of discretion.

## DISPOSITION

The judgment is affirmed.

22

_____
STEWART, P.J.

We concur.


_____
RICHMAN, J.


_____
MARKMAN, J.[*]


*Conservatorship of S.A.* (A164805)

_____

[*] Judge of the Alameda Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.